**Mrs. Billie B. McCLURE**

v.

**The SALVATION ARMY.**

**Civ. A. No. 13955.**

United States District Court,
N. D. Georgia,
Atlanta Division.

March 8, 1971.

Haas, Holland, Freeman, Levison & Gilbert, Atlanta, Ga., for plaintiff.

Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for defendant.

OPINION AND ORDER INCLUDING FINDINGS OF FACT AND CONCLUSIONS OF LAW

O'KELLEY, District Judge.

The plaintiff, a female officer of the Salvation Army, filed a Complaint pursuant to Title VII, Civil Rights Act of 1964, 42 U.S.C. § 2000e.

The defendant has filed its answer, and along with that, a motion to dismiss for want of jurisdiction, *inter alia.* It argues that it is a religious body or society as contemplated by the statute codi-

fied in 42 U.S.C. § 2000e–1 and that its activities and that of the officers of the Army are religious in nature and thus exempt under the law.

The pertinent part of that section reads:

"This subchapter shall not apply * * * to a religious corporation, association, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, or society of its religious activities * * *."

A hearing was held as to that issue on November 23, 1970, and the Court makes the following findings of fact and conclusions of law based upon the evidence presented at that time.

## I. FINDINGS OF FACT

The defendant is a corporation organized in 1927 under the laws of the State of Georgia and formed for the purpose of the location of a church in the County of Fulton, State of Georgia, and for the purpose of promoting the cause of Christian religion, charity and education in other localities throughout the State of Georgia and elsewhere. The Southern Territory of The Salvation Army extends from the border of Pennsylvania down to Guatemala in Central America and is composed of eleven divisions. A division is commanded by a division commander who has a staff and who is responsible to the Territorial Headquarters which for the Southern Territory is located in Atlanta, Georgia. Under the divisions there are corps ranging in number from seven to fifty. There are many corps within the Southern Territory.

The Salvation Army Corps is a family center for the dissemination of the Gospel, for the development of Christian life, and for the outreach in the particular community in which it is located. It is similar to any other church. It has a senior segment, a youth segment or Christian education department, and many other things that other churches have, including a structure for leadership training, and emergency training for disasters. The commanding officer of a corps acts as the "pastor" of the corps, but both the corps commander and every other officer of the Army stationed in the locality perform the function of preaching to the congregation.

The defendant conducts a Daily Vacation Bible School, which is also a normal church function. There is a Home League Department which is the equivalent of training for home service and is particularly for married women. There are senior citizens' clubs in practically every corps. There is also a Salvation Army band unit and a chorus in most of the corps. There is a group of local officers in most corps known as the Corps Council. There is also a group known as the Census Board which operates the affairs of the corps.

The corps is also called upon to do many things outside of its preaching ministry. There is a regular program for the visitation of homes. Food is provided to the needy and referrals of the sick are made to doctors and hospitals and other charitable functions.

There are approximately 1300 officers serving in the Southern Territory. An officer is one who has first received a divine call from God and has been accepted and trained and commissioned as a Salvation Army officer. Being commissioned in The Salvation Army is the equivalent to ordination. Officers of The Salvation Army are not permitted to have any outside employment whatever. Training of the officer consists of a two-year session of training. The officer is equivalent to the clergy of the church and can perform the four major ceremonies of the Army which include the swearing in of soldiers, performing marriages, burials and dedication of children. Salvation Army officers have served as chaplains in World War I, World War II and in Vietnam.

Officers are also divided into two basic classifications as to assignment; field and staff officers. There is no

distinction in wages or allowances, but there is a distinction in the duties performed. A field officer has the same common responsibility of a parish priest or of a Presbyterian or Baptist clergyman, being responsible for a congregation. Staff officers are similarly qualified to perform the ceremonies of the church, hold retreats and attend officers' councils, but are assigned specific functions in divisional or territorial headquarters.

While The Salvation Army officer is equivalent to the clergy of another church, the Salvation Army soldier is equivalent to the laity of another church. The Salvation Army has various steps that one must take before coming to soldiership. A person who is not affiliated with any church, who does not claim the Christian experience, must first go through a training program, called training for senior soldiership. Soldier applicants must become familiar with the doctrines, the steps that a person must take before becoming a Christian, must undergo a preliminary probation time, be reviewed by a census board, and then be accepted as a soldier in a ceremony conducted at a public meeting under The Salvation Army flag and under the flag of the Country. This is called the swearing-in ceremony and is used by The Salvation Army as its form of acceptance into the church. A solder is a layman and can be any person of any background in the community.

A person who does not have any other church affiliation, but is not prepared to make a commitment for Christian service and witness as a Christian, but who wants to have his name on a church roll for the purpose of burial, is known as an "adherent." In addition to adherents, there are persons known as "friends" who attend The Salvation Army services, but never become affiliated in any way. Numerous others are affiliated with the Army as "volunteers," lending moral support to The Salvation Army through membership on Advisory Boards and Women's Auxiliaries.

There is also a classification known as "employees," of which there are approximately 3,000 in the Southern Territory. Employees may be of any race, any background, any origin, and they generally bring with them certain needed skills, ranging from doctors to laborers, but they are never commissioned officers of the Army.

The Salvation Army has certain Orders and Regulations which serve as guidelines by which it operates. These Orders and Regulations outline the conduct of individuals, the steps to be taken in the performance of ceremonies, how to conduct meetings, etc. The Salvation Army has its own doctrine which is contained in The Salvation Army Handbook of Doctrine.

The original mission of The Salvation Army has remained unchanged. It is to seek the unsaved, to secure the commitment of those who are determined to live a Christian life, to give such people an opportunity for serving, remembering that membership in The Salvation Army, even as a soldier, imposes a greater burden upon an individual than he would assume by belonging to another church. The Salvation Army encourages the wearing of a uniform regularly and the participation in open air meetings. The soldier is identified by his uniform and marked out as a Salvationist. The Army has four major ceremonies: the swearing-in of soldiers, marriage, burial, and dedication of children. Religious services are held on Sundays and other days. They have all the elements of a Christian witness service. They have a preaching part, congregational singing, scripture reading, prayer and the invitation to the unsaved.

Mrs. Billie B. McClure was enrolled as a Junior Soldier as a child in The Salvation Army, and attended religious meetings and services. Her original application to The Salvation Army, dated 1961, was not approved. She renewed or

again presented her application to the Army for officership on or about April 15, 1965. She finished four years of college, going two years to San Angelo Junior College, and finished the remainder of her work at North Texas State University in Denton, Texas, receiving a bachelor of science in elementary education. She received a teacher's certificate from the State of Georgia and is presently engaged in teaching school with the Newton County Education Department in Newton County, Georgia.

Mrs. McClure entered The Salvation Army Officers' Training School in September of 1965. She studied the Bible and doctrine, bookkeeping, and Orders and Regulations for officers. Courses in music, band, songsters, education, religious education, publicity and public relations were also taught, as were certain elective courses, such as creative writing. She was first sent into the field to serve as a Salvation Army Officer (Cadet Lieutenant) in June, 1966; her first assignment was at Camp Hoblitzele in Texas. In August of 1966 she was assigned to Little Rock, Arkansas as Commanding Officer of the Little Rock Citadel Corps. She served in Little Rock from August, 1966, to May, 1967. She was next assigned as Commanding Officer of the Corps at Pascagoula, Mississippi, from June, 1967, to January, 1968. She next served as the Casework Supervisor in the Georgia Division in Atlanta, Georgia, from February 1, 1968, through October, 1969. Her final assignment in The Salvation Army was as a secretary in the Public Relations Department of the Southern Territorial Headquarters. The plaintiff, Mrs. McClure, regarded herself as a minister of the Gospel and as performing a religious function for the church at all times.

While serving as Commanding Officer of the Citadel Corps in Little Rock, Mrs. McClure was in charge of all senior and young people's character building programs. She also had charge of corps finances for local purposes and territorial appeals. She was responsible for the sale of The Salvation Army literature and was responsible for the weekly and monthly reports that had to be sent to Divisional Headquarters. She was authorized to perform all of the religious ceremonies of The Salvation Army, including the swearing-in of soldiers, the dedicating of babies, conducting all religious services, conducting marriages, and officiating at funerals. She swore in one member at Little Rock. She next served as the Commanding Officer of the Pascagoula, Mississippi Corps. Her functions as a minister were the same in Pascagoula as at Little Rock, except that they were enlarged somewhat because of her responsibility for all of the welfare and public relations and fund-raising programs. She conducted the Sunday School and a morning worship service on Sunday. She had a Bible class on Sunday afternoon for teenagers who were Corps Cadets. She also held a worship service on Sunday evening and a prayer meeting on Wednesday nights. In addition to these services, Mrs. McClure had interviews with applicants for emergency welfare assistance. There were also continual calls from county and state welfare agencies asking the Salvation Army to participate in various community services.

Mrs. McClure requested in September of 1967, while in Pascagoula, to be relieved from corps work because she did not feel that she could handle all the work that had to be conducted. She requested staff duty.

Mrs. McClure's superior officer as Casework Supervisor in Atlanta, Georgia, was Major James Childs, who was the administrator of the Welfare Department. Mrs. McClure's duty in this position was to coordinate the Emergency Welfare Service for the Metropolitan Area of Atlanta through the Welfare Department and emergency welfare service and family welfare service.

While working as Casework Supervisor, Mrs. McClure estimated that she spent four hours a week in corps activities; an hour for teaching Sunday

School class, an hour for work in Bible class, an hour for band practice, and an hour for song practice. She attended services at the Temple Corps on Seminole Avenue in Atlanta on Sunday mornings as a member of the Temple Corps. She also volunteered to be a Sunday School teacher at the Temple Corps.

In her last assignment in the Southern Territorial Headquarters, Mrs. McClure worked primarily as a secretary in the Public Relations Department.

Mrs. McClure felt that she was the spiritual leader of both the congregations in Little Rock and Pascagoula while serving as the Corps commander of these respective corps. While serving as Casework Supervisor in the Georgia Division at Atlanta, she conducted prayer services with the people that she was visiting and assisting, and she felt that these religious activities were an important part of her casework ministry. While serving in her last assignment in the Public Relations Department at Territorial Headquarters, she would engage in a prayer service known to her as a "knee drill prayer meeting." Mrs. McClure considered herself as performing a religious function for The Salvation Army, even while sitting behind a typewriter merely typing a letter. She was serving as a commissioned officer and as an ordained minister of the Salvation Army in her final job assignment in the Public Relations Department of the Southern Territorial Headquarters.

Mrs. McClure's officership with The Salvation Army terminated on July 19, 1970.

## II. ISSUES AND OPINION

Thus, the issues brought to a head are two. First, is The Salvation Army a religion, and second, were the activities performed by Mrs. McClure of a religious nature?

The Salvation Army has always been known as a charitable body, but the question of its being a religion has rarely arisen.

The rights guaranteed under the First Amendment of our Constitution are inalienable and personal. But the question of what is a religion as interpreted by the law has remained hazy throughout this country's existence. There have been various definitions for different purposes such as the test for a conscientious objector.

Without strict guidelines, nevertheless, this Court is of the opinion that The Salvation Army is a religion regardless of its lack of traditional houses of worship. The Salvation Army has been referred to as a body which practices religion. This was in a strong dissenting opinion in Prince v. Massachusetts, 321 U.S. 158, 64 S.Ct. 438, 88 L. Ed. 645 (1942).

But, more to home, The Salvation Army is a corporation organized and existing under the laws of Georgia formed for the purpose of the location of a church in Fulton County and for the purpose of promoting the cause of Christian religion, charity and education in other localities, in and out of Georgia.

The Supreme Court of Georgia has likewise held The Salvation Army to be a religion. In Bennett v. City of La-Grange, 153 Ga. 428, 433, 112 S.E. 482, 485 (1922) it ruled:

"A religious sect or denomination is one having a common system of faith. State v. Township 9, 7 Ohio St. 58. The term 'church' is one of very comprehensive signification, and imports an organization for religious purposes, for the public worship of God. * * * The Salvation Army is a benevolent and religious institution. It is likewise a church on wheels. It has the custody and control of all the temporalities and property belonging to the Salvation Army in the United States, and the revenues therefrom. It administers these revenues in accordance with its discipline, rules, and usages. Its entire receipts, revenues, and emoluments are devoted exclusively to its benevolent and philanthropic purposes, with the exception of a mod-

erate and reasonable compensation to those conducting and managing its affairs. Its work is primarily directed to the spiritual, moral, and physical reformation of the working classes, to the reclamation of the vicious, criminal, dissolute, and degraded, to visitation among the poor, lowly, and sick; and to the preaching of the gospel and the dissemination of Christian truth by means of open-air and indoor meetings. So it preaches the gospel. It disseminates Christian truth. *It is a church, a sect, and a religious institution.*" [Emphasis added.]

See also Salvation Army v. United States, D.C.N.Y.1956, 138 F.Supp. 914. Moreover, the plaintiff seems to have no issue with the Army's reference to itself as a religion.

We then come to the issue requiring a balance of duties by religious bodies to secular laws and the rights guaranteed by The First Amendment and granted under 42 U.S.C. § 2000e–1.

To decide whether the duties which a member of a religious group performs fall within the category of "religious activities" under § 2000e–1, is not an easy matter.

Nevertheless, to aid in deciding what is or is not religious activity, the Court looks to United States v. Kuch, 288 F. Supp. 439 on pages 443–444 (D.C., Dist. of Col., 1968) wherein the Court held:

"The dividing line between what is, and what is not, a religion is difficult to draw. The Supreme Court has given little guidance. Indeed, the Court appears to have avoided the problem with studied frequency in recent years. Obviously this question is a matter of delicacy and courts must be over careful not to permit their own moral and ethical standards to determine the religious implications of beliefs and practices of others. Religions now accepted were persecuted, unpopular and condemned at their inception."

"Subtle and difficult though the inquiry may be, it should not be avoided for reasons of convenience. There is need to develop a sharper line of demarkation between religious activities and personal codes of conduct that lack spiritual import. Those who seek the constitutional protections for their participation in an establishment of religion and freedom to practice its beliefs must not be permitted the special freedoms this sanctuary may provide merely by adopting religious nomonclature and cynically using it as a shield to protect them when participating in antisocial conduct that otherwise stands condemned. In a complex society where the requirements of public safety, health and order must be recognized, those who seek immunity from these requirements on religious grounds must at the very least demonstrate adherence to ethical standards and a spiritual discipline."

That Court further noted on page 445 that:

"The public interest is paramount and if properly determined the Congress may inhibit or prevent acts as opposed to beliefs even where those acts are in accord with religious convictions or beliefs. If individual religious conviction permits one to act contrary to civic duty, public health and the criminal laws of the land, then the right to be let alone in one's belief with all the spiritual peace it guarantees would be destroyed in the resulting breakdown of society."

Getting to specifics, the Court in the *Kuch* case, referred to examples of conduct which is regulated by law without offending the First Amendment.

"Mormons were not permitted to practice polygamy. Nor would the Constitution protect the practice of religions requiring infanticide, the killing of widows, or temple prostitution, as some religions have done in the past. The vital significance of the constitutional protection of religion will be diluted by a degree of tolerance that accepts the practice of

acts which leave society helpless to protect itself."

Those were religious activities, at least to those sects, but is welfare work, clerical work, and other normally secular work religious because it is done under the auspices of the religious corporation, i. e., The Salvation Army? Is a religious activity limited to ceremonial or ritualistic functions? Or, does it include support operations which people perform every day in the world of business?

In the case of Prince v. Massachusetts, *supra*, the law, as affirmed by the Court, invaded the province of the church. There, the Court explained that although the selling of literature was considered a religious activity by defendants and one which the Court would not dispute as being one of personal belief, it denied the children involved the privilege of selling literature if under eighteen. We refer to the decision because selling of religious literature was considered a religious activity. That case may be distinguished from the present case in its results. The statute involved in the present case provides an exemption for religious organizations employing its members in a religious activity.

In many more traditional religious bodies, laymen and laywomen who are members of the congregation volunteer and perform work of a secretarial, administrative and clerical nature without compensation, yet their work is not considered a purely religious function as would be the work of the minister, priest or rabbi, but it could be work connected with the carrying out of its religious activities.

Home visitation or in-town missionary work by laymen would be of a religious nature even though it may be performed by laymen.

Members of the officer corps of The Salvation Army receive a pittance for their holy work but then do not many others of various orders if they receive anything at all.

Would not the teaching of a nun or priest in a parochial school be considered religious activity? We think that the nexus between the parochial school and the religious body would require that their work be called "religious activity."

Since the work of officers in The Salvation Army is voluntary for religious reasons, as stated by William E. Chamberlain, Commander of the Southern Territorial Headquarters in his affidavit of August 14, 1970, and in his testimony at the hearing, and since Mrs. McClure attended special schooling intended to prepare her for her work with The Salvation Army, and since she is considered an ordained minister of The Salvation Army, and having attended to some rituals of a temporal nature, the Court, in considering the uniqueness of the manner in which The Salvation Army practices its religion, holds that Mrs. McClure's activities, which might seem secular, such as secretarial work, are supportive of her overall role yet an integral part of the Army's purely religious functions and activities. The Salvation Army does not maintain great cathedrals or traditional houses of worship, but take their message to the people, whether in welfare work, on the street, in a social services building or in a small church. Therefore, the Court feels that any allowance, salary, or funds received by the Officers, their work assignments or their places of assignment, among any other grievances Mrs. McClure may have, are matters of religious activity into which the Court may not inquire under prior decisions and § 2000e–1. It is significant to note that Mrs. McClure performed some functions which only an officer (ordained member) might perform. It is even more significant that plaintiff affirmed that she considered herself performing a religious function while doing certain mundane tasks, such as typing. These activities when considered as an integral whole, demonstrate adherence to ethical standards and a spiritual discipline.

For these reasons, the Court concludes that the activities of Mrs. McClure were connected with carrying on of the religious activities of The Salvation Army in accordance with 42 U.S.C. § 2000e–1.

Therefore, the Motion to Dismiss the Complaint for want of jurisdiction is sustained, and it is so ordered.