## B. Ray FIKE

### v.

## UNITED METHODIST CHILDREN'S HOME OF VIRGINIA, INC.

### Civ. A. No. 79–0923–R.

United States District Court,
E. D. Virginia,
Richmond Division.

April 30, 1982.

Stephen W. Bricker, Bricker & Zerkin, Richmond, Va., for plaintiffs.

Jack B. Russell, Browder, Russell, Little, Morris & Butcher, Richmond, Va., for defendant.

## OPINION

WARRINER, District Judge.

## I. INTRODUCTION

On 21 November 1979, plaintiff filed a complaint alleging that defendant United Methodist Children's Home dismissed him as director because he was a Methodist layman and the Home desired a Methodist minister in the position. Plaintiff charged that the dismissal constituted religious discrimination in violation of the United States Constitution, Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.*, and anti-discrimination provisions in contracts between defendant and agencies of both the State and the federal government. On 7 July 1981, this Court dismissed the complaint on the ground that the complaint alleged discrimination based upon gradation rather than a claim of religious discrimination. *Fike v. United Methodist Children's Home of Va., Inc.,* 493 F.Supp. 935 (E.D.Va.1980).

On 1 April 1981, the Fourth Circuit Court of Appeals 660 F.2d 489 in an unpublished per curiam opinion reversed and remanded, stating in full:

Plaintiff, a former executive director of the United Methodist Children's Home of Virginia, Inc., appeals the dismissal of his religious discrimination action against the Home. He contends that the Home discharged him, a Methodist layman, so that it could place a Methodist minister in the job, and that this action violated the First and Fourteenth Amendments, Title

VII, and provisions in contracts between the Home and governmental agencies.

In his complaint, plaintiff alleged that the Home was engaged in "state action" because a majority of its children are wards of the state, a substantial portion of the Home's income derives from the government, and its employment and child care practices are regulated by the state and federal governments. A reasonable inference to be drawn from these allegations, as plaintiff argues, is that the Home is a secular institution. In light of the allegations and that inference, we conclude that the motion to dismiss, which presupposes the correctness of plaintiff's position, was improvidently granted. We remand the case to the district court for at least a preliminary determination as to whether the Home is a secular or sectarian institution. Our decision does not foreclose consideration of a motion for summary judgment based upon the materials now before the district court or as they may be supplemented.

The Court remains somewhat confused as to the proper interpretation of the Fourth Circuit's opinion. *See Fike v. United Methodist Children's Home of Va., Inc.,* 514 F.Supp. 254 (E.D.Va.1981). However, in an attempt to comply with the Fourth Circuit's mandate, the Court will first determine if defendant Home is "a secular or sectarian institution" and, depending upon such determination, whether it is entitled to an exemption under 42 U.S.C. § 2000e–1 from the Title VII prohibition against religious discrimination.[1] Additionally, though not required by the mandate, the Court will determine if the Home is engaged in State action and is thus within the establishment prohibitions of the First Amendment.

Since remand, the parties have filed and fully briefed cross-motions for summary judgment. On the basis of the briefs, exhibits, and affidavits, the Court will grant defendant's motion for summary judgment because on the undisputed material facts there is no religious discrimination under the Title VII and government contract claims and there is no State action in the First Amendment claim.

## II. FACTS

Defendant Home has historically been a home for orphans or for children whose parents were unable to take care of them. The Home was founded by and over the years has had close ties with the Methodist Church. Most of the children had been placed in the Home from private sources through Church auspices. Prior to plaintiff's appointment, all directors of the Home had been ordained Methodist ministers. In the 1970s, the need for an orphans' home diminished. Therefore, the Board of Trustees adopted a shift in its policy and in its program. A new type of youngster, the older child who had gotten into trouble with the law or was having difficulty at home, was seen as in need of institutional services. This type of youngster was often referred by various public agencies dealing with youths. Plaintiff was hired on or about 1 July 1974 to develop this program. The Board directed plaintiff to develop contacts with public agencies serving troubled youths—local welfare departments, juvenile courts, the State Department of Corrections—and to solicit referrals.

---

1. This Court understands that a determination of the secular or sectarian nature of the Home is necessary to decide whether the Home is entitled to the religious exemption in § 2000e–1. But the religious exemption from a charge of religious discrimination is unnecessary if, as this Court held, plaintiff failed to state a claim of religious discrimination. While the Fourth Circuit did not question this Court's holding that plaintiff had failed to state such a claim, its directions to this Court imply such questioning; otherwise, the Fourth Circuit has sent this Court on a fool's errand. However, the Fourth Circuit opinion provided no guidance for this Court on the discrimination claim and indicated no errors in the law or the logic relied on by this Court.

A remand to determine if the Home was engaged in State action would be understandable. This Court did not in its original opinion consider the First Amendment establishment claim, a claim which would survive a motion to dismiss if plaintiff could establish State action.

During the period that plaintiff was director of the Home, the number of children in the Home placed by the State increased. Pursuant to contracts between the Home and government agencies, the Home received funds from the State to pay for the services and care provided the children. The Home was subject to regulations by the agencies placing the children.

Because of these dramatic changes in the mission, operation, and conduct of the Home, criticism began to develop within the United Methodist Church that the Home was moving in a non-sectarian direction. Thus, in 1978, the governing body of the Church recommended that plaintiff be dismissed and that a Methodist minister be hired as director in order to bring the Home back to the Church structure. On or about 30 November 1978, in pursuance of this reconversion plaintiff was dismissed.

## III. TITLE VII

Plaintiff alleges that his dismissal violates the Title VII prohibition against religious discrimination:

> It shall be an unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–2(a)(1).

Defendant argues that it is exempt from this provision of Title VII pursuant to 42 U.S.C. § 2000e–1:

> This title [42 USCS §§ 2000e *et seq.*] shall not apply to an employer with respect to the employment of aliens outside any state, or to a religious corporation, association, educational institution or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

Plaintiff alleges that while defendant Home publicly holds itself out as a sectarian organization and, in fact, seeks to promote religion in various of its activities and to maintain certain contacts with the United Methodist Church, it is not a bona fide "religious organization" under § 2000e–1. Plaintiff argues that for purposes of § 2000e–1 defendant Home is a secular organization.

Defendant argues that the Home is an integral part of the United Methodist Church in Virginia. It was originally organized to carry on the Church's function of caring, supporting, and nurturing children and inculcating in them the Christian beliefs and tenets. During plaintiff's tenure, the Board of Trustees of the Home drafted a "statement of church relatedness" to pronounce officially its ties with the Church. Trustees of the Home must be confirmed by the Virginia Methodist Annual Conference. A trustee must be a member in good standing of the Methodist Church.

In rebuttal, plaintiff argues that although members of the Board of Trustees must be members of the Methodist church, the Board operates separately from the Church itself and is an independent corporation. Plaintiff asserts that while the Home may have operated as a sectarian organization in its early years, this course was wholly abandoned during plaintiff's administration. Additionally, plaintiff contends, evidence that defendant may be attempting at this time to regain its nature as a sectarian organization is irrelevant in determining the nature of the Home at the time of plaintiff's dismissal.

Defendant admits that the chapel is no longer used for religious services. In fact, no religious services have been held on the campus since 1978. Aside from a painting of the Bishop in the administration building, there are no religious symbols whatsoever in the cottages or anywhere else on the campus. While a Bible may be provided to any child who specifically requests it, Bibles are not provided to each child and are not placed in each cottage; while a chaplain is on the staff, the chaplain never engages in Bible study or prayer groups. In fact, such instruction in theology as is conducted by

the chaplain involves various perspectives and concepts, including without any normative teaching, atheism. Attendance at religious services is not encouraged and is purely voluntary. Indeed, in light of the affidavits of responsible officials of the Home filed in this case, it would appear that the incumbent chaplain is indifferent to the Christian religion.[2] Plaintiff argues that defendant has tried to serve God and mammon by representing to the Church its sectarian nature and representing to the government its secular nature. There is merit in this contention.

There is little precedent on the meaning of "religious corporation" under § 2000e–1. In *McClure v. Salvation Army*, 323 F.Supp. 1100 (N.D.Ga.1971), *aff'd*, 460 F.2d 553 (5th Cir. 1972), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972). The Court held that the Salvation Army is a religious corporation within the meaning of § 2000e–1. The decision was based on an analysis of the various branches of the organization, each established for the purpose of disseminating the Christian gospel and developing the Christian life. The Court noted, "The original mission of the Salvation Army has remained unchanged. It is to seek the unsaved, [and] to secure the commitment of those who are determined to live a Christian life...." *Id.* at 1102.

While the original mission of the United Methodist Children's Home may have been to provide a Christian home for orphans and other children, that mission has not remained unchanged. The facts show that as far as the direction given the day-to-day life for the children at the Home is concerned, it is practically devoid of religious content or training, as such. While the purpose of caring for and providing guidance for troubled youths is no doubt an admirable and a charitable one, it is not necessarily a religious one. For an organization to be considered "religious" requires something more than a board of trustees who are members of a church. The Court, therefore, holds that for the purposes of the exemption in § 2000e–1 the United Methodist Children's Home is, quite literally, Methodist only in name. It is a secular organization.[3]

Having found that the Title VII prohibition against religious discrimination applies in this case, the Court adheres to its original ruling that plaintiff has failed to state a claim of religious discrimination. 493 F.Supp. 935 (E.D.Va.1980). As this Court held, plaintiff has not alleged that he was dismissed because he is a Methodist; rather, he alleges that he was dismissed because he is not a minister. The Court stated, "The difference between their re-

2. While some of the admissions made by defendant and reiterated here were for the purpose of establishing that the Home was secular and therefore not in violation of the establishment clause in receiving State funds, these admissions cannot be denied in determining whether the Home is a religious organization and entitled to the Title VII exemption.

3. Defendant does not argue that it is an educational institution and thus entitled to the more narrowly drawn but more lenient exemption under 42 U.S.C. § 2000e–2(e)(2):

It shall not be an unlawful employment practice for a school, college, university, or other educational institution or institution of learning to hire and employ employees of a particular religion if such school, college, university, or other educational institution or institution of learning is, in whole or in substantial part, owned, supported, controlled, or managed by a particular religion or by a particular religious corporation, association, or society, or if the curriculum of such school, college, university, or other educational institution or institution of learning is directed toward the propagation of a particular religion.

Section 2000e–1 originally exempted all educational institutions from the provisions of Title VII, in addition to exempting religious organizations from religious preference in hiring. In 1972, § 2000e–1 was amended to eliminate the exemption for educational institutions, but adding religious educational institutions to the exemption from religious preference.

§ 2000e–2(e)(2) is a specific provision which complements § 2000e–1. § 2000e–2(e)(2) contains a statutory definition of a religious educational institution. In contrast, § 2000e–1 contains no statutory definition of a religious corporation. *See I Larson, Employment Discrimination*, § 5.60.

The residents of the Home attended public schools until Charterhouse, an in-house private school, was established in 1979.

spective status as laymen or minister is not a religious difference." *Id.* at 938.

The contract provisions which plaintiff alleges were also violated simply state that the Home shall not discriminate against its employees or those seeking the Home's services because of age, race, color, religion, sex, or national origin. A finding that the Home did not discriminate against plaintiff on the basis of religion under Title VII obviously carries with it a finding of no violation of the anti-discrimination clause in the service contracts.

## IV. FIRST AMENDMENT

Plaintiff additionally alleges that defendant's action in firing plaintiff and hiring a minister in order to move the Home closer to the Church structure violates plaintiff's rights under the free exercise and establishment clauses of the First Amendment. Since the religion clauses of the First Amendment apply only to actions of a government, plaintiff must at the outset establish State action to prevail under his First Amendment claim. The holding above that defendant is a secular organization does not imply that defendant's actions constitute State action.[4]

The parties disagree on the proper legal standard to apply in determining State action. Plaintiff argues that the controlling authority on the issue of State action is *Burton v. Wilmington Parking Authority,* 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Defendant argues that *Burton's* test of a "symbiotic" relationship between the private entity and the State has been replaced by the "nexus" test of *Moose Lodge 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972), and *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

In *Burton,* the Eagle Shoppe, Inc., was a private corporation that operated a restaurant as lessee in a building owned and located wholly within a parking lot owned by the State. The State had granted the Wilmington Parking Authority, a State subdivision, the power to lease portions of the building as necessary to finance and maintain the parking facility. Eagle refused to serve plaintiff solely because of his race. "By sifting facts and weighing circumstances," *Id.* 365 U.S. at 722, 81 S.Ct. at 860. The Supreme Court determined that the "State has so far insinuated itself into a position of interdependence with Eagle that it must be recognized as a joint participant in the challenged activity." *Id.* at 725, 81 S.Ct. at 861. The Supreme Court later referred to this interdependence as a symbiotic relationship. *Moose Lodge 107 v. Irvis,* 407 U.S. 163, 174, 92 S.Ct. 1965, 1972, 32 L.Ed.2d 627 (1972).

The following "facts and circumstances" were factors considered relevant by the Court in finding State action: (1) the land and building were publicly owned; (2) the building was dedicated to public uses in performing the Authority's governmental functions; (3) the commercially leased area was an indispensable part of the State's plan to operate the project as a self-sustaining unit; (4) the upkeep and maintenance of the entire building were payable out of public funds; (5) improvements made on the property by Eagle which were attached to the realty were tax exempt; (6) the Authority furnished heat to the restaurant and agreed to provide all necessary structural repairs; (7) guests of the restaurant provided additional business for the parking facility; (8) profits earned by discrimination contributed to the success of the governmental venture; and (9) the State had placed its power, property, and prestige behind the discrimination. After enunciating these factors, the Court limited its holding to the particular facts:

Specifically defining the limits of our inquiry, what we hold today is that when a State leases public property in the manner and for the purposes shown to have been the case here, the proscriptions of

---

4. This simple and self-evident fact is the basis for much of this Court's confusion with the Fourth Circuit's direction on remand. In directing this Court to determine whether the

Home was secular or sectarian, the Fourth Circuit appeared to do so on the basis of plaintiff's assertions of State action. *See* n. 1.

the Fourteenth Amendment must be complied with by the lessee as certainly as if they were binding covenants written into the agreement itself. *Id.* 365 U.S. at 726, 81 S.Ct. at 862.

Eleven years after *Burton,* the Supreme Court decided *Moose Lodge 107 v. Irvis,* 407 U.S. 163, 92 S.Ct. 1965, 32 L.Ed.2d 627 (1972). Like *Burton, Moose Lodge* involved a refusal to serve solely on account of race. Although the Moose Lodge was on private property, plaintiff argued that because the State Liquor Board had issued the Lodge a license for the sale of alcoholic beverages on its premises, the refusal to serve was State action. The Supreme Court disagreed, emphasizing that neither the receipt of a benefit from the State nor a subjection to State regulations is sufficient alone to establish State action, especially in the absence of any suggestion that the purpose of the regulations was to encourage discrimination. *Id.* at 173, 92 S.Ct. at 1972.

The following factors were considered relevant in *Moose Lodge* to the finding of no State action: (1) the Lodge conducted all of its activities in a building owned by it; (2) it was not publicly funded; (3) the Lodge proclaimed that it was not open to the public; (4) it did not perform a service that would otherwise be performed by the State. These facts were seen as clearly distinguishable from *Burton:* "In short, while Eagle was a public restaurant in a public building, Moose Lodge is a private social club in a private building." *Id.* at 175, 92 S.Ct. at 1972. Thus, there was no symbiotic relationship · between Moose Lodge and the State. Although the Lodge had to abide by State regulations to be licensed by the State Liquor Control Board, the regulations neither fostered nor encouraged racial discrimination.

*Moose Lodge* does not replace *Burton;* in fact, the Court relied on *Burton* and found the cases distinguishable on the facts. *Burton* and *Moose Lodge* read together stand for the proposition that in the absence of a symbiotic relationship of the type found in *Burton* and in the absence of regulations encouraging or requiring the action charged

as being illegal, State regulation of other activities of a defendant does not constitute State action. This premise was further explained in *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974).

In *Jackson,* the plaintiff alleged that a utility company's termination of electric service to her home for nonpayment of bills deprived her of property by the State without due process of law in that she was given neither notice nor a hearing. The electric company was a privately owned and operated corporation empowered by the State Utility Commission to deliver electricity. Being a monopoly, it was subject to extensive and pervasive regulation by the Commission. The Court stated that even extensive and detailed regulations of a business by the State does not convert the actions of the business into actions of the State. And this was true even though the challenged procedure of customer termination had been submitted to and had been approved by the State Utility Commission. 419 U.S. at 350, 354, 95 S.Ct. at 453, 455. Rather, "the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself." *Id.* at 351, 95 S.Ct. at 453. After finding no nexus between the State's regulations and the challenged action, the Court stated: "We also find absent in the instant case the symbiotic relationship presented in *Burton v. Wilmington Parking Authority.*" *Id.* at 358, 95 S.Ct. at 457.

Accepting plaintiff's argument based on these cases that there is no single test for determining State action, the facts must nevertheless establish State action under some acceptable standard. Plaintiff argues first that State action exists under the symbiotic standard of *Burton,* citing four Fourth Circuit decisions decided after *Burton* as guidance for the Court in the types of evidence necessary to establish State action. However, *Baldwin v. Appalachian Power Co.,* 556 F.2d 241 (4th Cir. 1977), found State action not under the symbiotic

test but rather under the public function test. *Doe v. Charleston Area Medical Center,* 529 F.2d 638 (4th Cir. 1975), found State action on the basis of the receipt of Hill-Burton funds and the involvement of the State in the specific action under attack. *Christhilf v. Annapolis Emergency Hospital,* 496 F.2d 174 (4th Cir. 1974), also decided the issue on the basis of the receipt of Hill-Burton funds, as did *Simkins v. Moses H. Cone Memorial Hospital,* 323 F.2d 959 (4th Cir. 1963). None of the cases cited by plaintiff as explaining *Burton* mentions or applies Burton's symbiotic test.[5]

■ While various factors may be considered in determining the existence of a symbiotic relationship, the most important factor may be the ownership of the involved property.[6] In contrast to *Burton,* the land and buildings here are not publicly owned. Additionally, there is no suggestion that by placing children in the Home the State had the purpose of evading constitutional requirements. *See Evans v. Newton,* 382 U.S. 296, 86 S.Ct. 486, 15 L.Ed.2d 373 (1966). Likewise, there is no allegation that the Home's program was an indispensable part of a governmental venture. Considering the Supreme Court's repeated pronouncements of the limitations of *Burton, Burton v. Wilmington Parking Authority,* 365 U.S. at 726, 81 S.Ct. at 862; *Moose Lodge 107 v. Irvis,* 407 U.S. at 174, 92 S.Ct. at 1972; *Jackson v. Metropolitan Edison Co.,* 419 U.S. at 358, 95 S.Ct. at 457, the Court holds that the undisputed facts of this case cannot support a finding of State action under the symbiotic standard.

Plaintiff additionally asserts that State action exists under the following standards: (1) the defendant private entity performs a public function; (2) the receipt of substantial governmental funding brings an otherwise private entity within the ambit of State action; and (3) extensive regulation by State authorities converts private conduct into State action.

■ The first and third arguments have been decided by the Supreme Court in a manner adverse to plaintiff's position. In order to convert otherwise private action into State action under the public function test, the private entity must be performing a function that is traditionally exclusively a governmental function, such as conducting a State election, *Terry v. Adams,* 345 U.S. 361, 73 S.Ct. 701, 97 L.Ed. 1071 (1953); or performing all of the necessary municipal functions in a privately-owned town, *Marsh v. Alabama,* 326 U.S. 501, 66 S.Ct. 276, 90 L.Ed. 265 (1946). Providing care and education for orphans or for troubled youths is not a traditionally exclusive governmental function. Indeed, it is, or was, traditionally a religious or church function.

The public function test is a narrow one, as the Supreme Court made clear in *Flagg Bros., Inc. v. Brooks,* 436 U.S. 149, 158, 98 S.Ct. 1729, 1734, 56 L.Ed.2d 185 (1978): "While many functions have been traditionally performed by governments, very few have been 'exclusively reserved to the state.'" In *Flagg Bros.,* the Supreme Court noted that it had applied the public function doctrine only in the two contexts

---

**5.** In *Manning v. Greensville Memorial Hospital,* 470 F.Supp. 662 (E.D.Va.1979), Judge Merhige notes that in several cases finding State action on the basis of the receipt of Hill-Burton funds, the Fourth Circuit has failed to follow *Burton's* suggested procedure of "sifting facts and weighing circumstances" and also has failed to confront the effect of *Moose Lodge* and *Jackson* on these decisions. *Id.* at 667–68. The Fourth Circuit's most recent decision on State action likewise avoids analysis and significant application of Supreme Court precedent. *Swann v. Gastonia Housing Authority,* 675 F.2d 1342 (4th Cir. 1982). The Fourth Circuit's refusal in these cases to recognize *Moose Lodge* and *Jackson* leaves a trial judge in a quandary.

**6.** In *Burton,* the Court stated that while every leasing agreement with the State does not make the lessee a State actor,

> when a State leases public property in the manner and for the purposes shown ... here, the proscriptions of the Fourteenth Amendment must be complied with. 365 U.S. at 726, 81 S.Ct. at 862.

In *Jackson,* the Court noted that the actual holding in *Burton* was limited to lessees of public property. The Court found no symbiotic relationship, stating first that "Metropolitan is a privately owned corporation, and it does not lease its facilities from the State of Pennsylvania." 419 U.S. at 358, 95 S.Ct. at 457.

mentioned above, *i.e.*, elections and company towns. The facts in *Flagg Bros.*, a warehouseman's sale of goods under the Uniform Commercial Code, did not persuade the Court to "extend the sovereign-function doctrine outside of its present carefully confined bounds." *Id.* at 163, 98 S.Ct. at 1737. Plaintiff's argument that defendant was performing a public function fails.

■ The third argument presented by plaintiff likewise cannot support a finding of State action in this case. The Supreme Court held in *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974) that extensive regulation of a private entity by the State is insufficient to establish State action. The Court stated:

> The mere fact that a business is subject to State regulation does not by itself convert its action into that of the State for purposes of the Fourteenth Amendment. Nor does the fact that the regulation is extensive and detailed, as in the case of most public utilities, do so ... but the inquiry must be whether there is a sufficiently close nexus between the State and the challenged action of the regulated entity so that the action of the latter may be fairly treated as that of the State itself. *Id.* at 350–51, 95 S.Ct. at 453.

This Court followed *Jackson* in *Trageser v. Libbie Rehabilitation Center, Inc.*, 462 F.Supp. 424 (E.D.Va.1977), aff'd, 590 F.2d 87 (4th Cir. 1978). In *Trageser*, plaintiff alleged that defendant, a private corporation which operated a nursing home, engaged in State action in terminating her employment. Plaintiff based her argument primarily on State regulation of the nursing home. Relying on *Moose Lodge* and on *Jackson*, this Court held that the required nexus between the State and the challenged action did not exist. In its affirmance of the District Court in 590 F.2d 87 at 90 (4th Cir. 1978), the Court of Appeals recited that the State inspector had told the administra-

tor of the Center that plaintiff's eyesight had deteriorated and had asked what the Center intended to do about it. It held, citing *Jackson*, that this was not a sufficient nexus to establish State action in the termination of plaintiff's employment. In the case at bar, there is no allegation that the State participated in any manner in the decision of the Board to change its policy or to dismiss plaintiff and to hire an ordained Methodist in his stead. Therefore, under the *Jackson* test, defendant's decision to dismiss plaintiff cannot be considered an action of the State itself.

The second factor that plaintiff relies on to establish State action is the receipt by an otherwise private entity of substantial governmental funding. While an argument can be made that in the Fourth Circuit the receipt of Hill-Burton funds is sufficient to bring the actions of a hospital within the ambit of State action, *Doe v. Charleston Area Medical Center, supra; Christhilf v. Annapolis Emergency Hospital, supra,* these cases appear to be *sui generis,* and may be of questionable authority considering the Supreme Court's ruling in *Jackson. See Manning v. Greensville Memorial Hospital,* 470 F.Supp. 662 (E.D.Va.1979). Few other Circuits now agree with the Fourth Circuit in such cases.[7]

■ Additionally, in the case at bar, defendant does not receive general funding to allocate as it wishes. Rather, the Home is compensated for the services it provides to each individual child. This Court held in *Trageser* that the payment for services rendered under Medicare, Medicaid, and Veterans Administration programs was insufficient to transform the acts of the nursing home into those of the State. *Trageser v. Libbie Rehabilitation Center, Inc.,* 462 F.Supp. at 426. The Fourth Circuit in its affirmance noted that the purpose of the payments was to compensate the hospital for treatment of specified patients who are entitled to the benefits. 590 F.2d at 88. Plaintiff has cited no cases holding that the

---

7. The Fourth Circuit itself noted in *Doe v. Charleston Area Medical Center, Inc.,* 529 F.2d 638, 642 n. 8 (4th Cir. 1976), that the Second, Fifth, Sixth, Seventh and Ninth Circuits disagree with the Fourth Circuit's holdings on the effect of Hill-Burton funds.

5

payment of money by the State for goods or services transforms the vendor into the State. Thus, this Court holds that the monies received from the State are not of the nature to establish State action in this case.[8]

Because plaintiff has failed to establish State action under any of the prevailing standards, the Court grants defendant's motion for summary judgment on the claim that defendant's dismissal of plaintiff violated either of plaintiff's religion based First Amendment rights.

## V. STANDING

On 8 December 1981, the Court granted plaintiff's motion for leave to file an amended complaint. The amended complaint added Charterhouse School, Inc., as a defendant. Plaintiff alleges that defendant Home established Charterhouse in 1979 as a separate corporation for the sole purpose of creating a conduit for government funds to defendant Home which it believed it could not otherwise receive. However, plaintiff asserts, the two corporate defendants actually constitute a single legal entity. Plaintiff charges that defendants Home and Charterhouse are in violation of the establishment clause of the First Amendment to the United States Constitution in that their activities have resulted in the use of State funds for the promotion of religious activities and in an excessive entanglement between church and State. Plaintiff seeks to enjoin further receipt by Home or Charterhouse of government funds.

Defendants argue that, accepting as true plaintiff's allegations that defendant Home controls and manages defendant Charterhouse solely to receive funds from the State Department of Education which it could not obtain in its own name, plaintiff lacks standing to seek to enjoin defendants from receiving such State aid. Defendants rely on the most recent Supreme Court decision on the issue of standing, *Valley Forge*

*Christian College v. Americans United for Separation of Church and State, Inc.,* —— U.S. ——, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982).

In *Valley Forge,* the Department of Health, Education and Welfare, pursuant to 40 U.S.C. § 484, conveyed a tract of "surplus" government land to Valley Forge Christian College, discounting the appraised value 100% under a public benefit allowance. The institution planned to use the land to train men and women for Christian service. Americans United, a nonprofit organization of 90,000 taxpayer members, brought suit alleging that the conveyance violated the establishment clause of the First Amendment. Plaintiff sought an order compelling defendant to transfer the property back to the government.

The District Court dismissed the suit, holding that plaintiff lacked taxpayer standing under *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), which extended taxpayer standing only for challenges to the congressional exercise of the power to tax and spend, Article I, § 8. In *Valley Forge,* Congress had enacted the statutes permitting the conveyance under Article 4, § 3, which vests Congress with the "power to dispose of and make all needful rules and regulations respecting the ... property belonging to the United States." The Court of Appeals reversed, agreeing that plaintiffs lacked standing under *Flast* but finding standing for plaintiffs merely as citizens claiming injury in fact to their shared individual rights to a government which will make no law "respecting the establishment of religion." 619 F.2d 252, 261 (3d Cir. 1980).

In an opinion reviewing case precedent on standing, the Supreme Court reversed. To establish standing, plaintiff must show "that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defend-

---

**8.** In *Gastonia* the Fourth Circuit mentioned the payment of rent by the State to the landlord of a poor tenant as a factor to be considered in determining the existence of State action. No authority was given for this dictum nor was the

Fourth Circuit's recent *Trageser* compensation-for-services factor distinguished. In any event, in *Gastonia* State action was found in the clear nexus between the State and the eviction process.

ant," *Gladstone, Realtors v. Village of Bell-wood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision." *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976). The requirement of "distinct and palpable injury . . . that is likely to be redressed if the requested relief is granted," *Warth v. Seldin,* 422 U.S. 490, 499, 501, 95 S.Ct. 2197, 2205, 2206, 45 L.Ed.2d 343 (1975), states a limitation on judicial power, not a "prudential" consideration. *Valley Forge,* —— U.S. at ——, 102 S.Ct. at 756.

Upon the basis of this review the Supreme Court affirmed that respondents had failed to establish taxpayer standing. The Court pointed out that taxpayer standing is limited to challenges directed at the exercise of congressional power. *Flast v. Cohen,* 392 U.S. at 102, 88 S.Ct. at 1953. The *Valley Forge* respondents were challenging a decision by HEW to transfer a parcel of federal property. The complaint significantly did not allege that the statutes from which HEW derived its authority to convey the property were unconstitutional. Thus on this basis as well as the basis that the transfer was not an exercise of authority under the taxing and spending clause, the Court held there was no Flast, or taxpayer, standing.

Once the Court determined that respondents were clearly without standing as taxpayers, it considered whether they had alleged any other basis for standing. The Court of Appeals had held that the plaintiffs as separationists had established a particular injury to a personal constitutional right.

Rejecting the argument that the establishment clause creates a right that is more "fundamental" than other constitutional rights, the Supreme Court emphasized that a claim that the Constitution has been violated is not enough. To establish standing one must identify a personal injury suffered as a consequence of the alleged constitutional error; the expenditure of public funds in an allegedly unconstitutional manner is not an injury sufficient to confer standing. *Doremus v. Board of Education,* 342 U.S. 429, 434, 72 S.Ct. 394, 397, 96 L.Ed. 475 (1952). The Court stressed that the case and controversy requirement is not merely a convenient vehicle for correcting constitutional errors. Standing requires more than important issues and able litigants; standing requires an injured party as a plaintiff. *Valley Forge,* —— U.S. at ——, 102 S.Ct. at 767. The Court stated, "The federal courts were simply not constituted as ombudsmen of the general welfare." *Id.* at ——, 102 S.Ct. at 766.

■ Applying *Valley Forge* to the case at bar, plaintiff lacks standing. He is neither a child enrolled at the Home or at Charterhouse nor the parent of such child. He is not presently an employee of either defendant. He asserts no claim on the basis of his past or present membership in the Methodist Church. His only status as alleged in the complaint is that of a citizen and taxpayer of Henrico County, Virginia. He has not alleged that any particular statute, either federal or State, violates the establishment clause in this case. Rather, his allegations focus upon administrative decisions and activities of the Virginia Departments of Welfare, Education and Corrections. Plaintiff has alleged no injury to himself resulting from the defendants' receipt of government funds. In fact, plaintiff's job was terminated in 1978; Charterhouse School was not founded until 1979. In his amended complaint plaintiff does not seek reinstatement. A ruling that the defendants "cease all activities which result in an unconstitutional entanglement between church and State" would not redress any individual or personal injury which plaintiff claims to have incurred from his dismissal. Because plaintiff has failed to establish the requisite case and controversy under the claim for injunctive relief, the Court will grant defendants' motion for summary judgment on the Charterhouse claim on the ground that plaintiff lacks standing to bring such claim.

An appropriate order shall issue.