BILL LOCKYER Attorney General ROBERT L. MUKAI Deputy Attorney General
The HONORABLE SCOTT R. BAUGH, MEMBER OF THE STATE ASSEMBLY, has requested an opinion on the following question:
Is a postsecondary educational institution that is not directly owned or operated by a church or similar religious entity but rather by a nonprofit, tax exempt organization governed by an independent board of trustees under policies which follow specific religious tenets exempt from the requirements of the Sex Equity in Education Act?
 CONCLUSION
A postsecondary educational institution that is not directly owned or operated by a church or similar religious entity but rather by a nonprofit, tax exempt organization governed by an independent board of trustees under policies which follow specific religious tenets is exempt from the requirements of the Sex Equity in Education Act when a commitment to a religious purpose is manifest in its mission, as demonstrated by such traits as its historical origins, charter and bylaws, affiliation with a church or similar religious entity, and tax exempt status.
 ANALYSIS
The Sex Equity in Education Act (Ed. Code, §§ 66250-66293; "Act")[1] prohibits certain postsecondary educational institutions from discriminating in their programs and activities on the basis of sex, ethnic group identification, race, national origin, religion, color, mental or physical disability, ancestry, and sexual orientation. An exemption from the prohibition is contained in the Act for "an educational institution that is controlled by a religious organization." We are asked whether an institution that is not directly owned or operated by a church or similar religious entity but rather by a nonprofit, tax exempt organization governed by an independent board of trustees under policies which follow specific religious tenets would come within the language of the exemption. We conclude that it may, depending upon the particular circumstances.
The basic prohibition of the Act is contained in section 66270:
 "No person shall be subjected to discrimination on the basis of sex, ethnic group identification, race, national origin, religion, color, or mental or physical disability, or any basis that is contained in the prohibition of hate crimes set forth in subdivision (a) of Section 422.6 of the Penal Code in any program or activity conducted by any postsecondary educational institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid."
Penal Code section 422.6, subdivision (a) prohibits hate crimes on the basis of "race, color, religion, ancestry, national origin, disability, gender, or sexual orientation," including the perception of any of these characteristics.
Section 66270.5 is the focus of our analysis, providing an exemption from the Act's prohibitory language. Section 66270.5
states:
 "This chapter shall not apply to an educational institution that is controlled by a religious organization if the application would not be consistent with the religious tenets of that organization."
In analyzing the language of section 66270.5, we rely upon well recognized principles of statutory interpretation. "When construing a statute, we must `ascertain the intent of the Legislature so as to effectuate the purpose of the law.' [Citation.]" (Wilcox v. Birtwhistle (1999) 21 Cal.4th 973, 977.) "Our first step [in determining the Legislature's intent] is to scrutinize the actual words of the statute, giving them a plain and common-sense meaning. [Citations.]" (People v. Valladoli (1996) 13 Cal.4th 590, 597.) "Of course, we interpret a statute in context, examining other legislation on the same subject, to determine the Legislature's probable intent. [Citations.]" (California Teachers Assn. v. Governing Bd. of Rialto Unified School Dist. (1997)14 Cal.4th 627, 642.)
Applying these principles to the Act's provisions, we note first that not all postsecondary educational institutions are subject to the general prohibition of section 66270. As limited by the terms of the statute itself, only an "institution that receives, or benefits from, state financial assistance or enrolls students who receive state student financial aid" comes within the prohibition of section 66270. Here, we may assume that the educational institution in question meets the financial assistance or aid requirement.
As to the language of section 66270.5 granting an exemption for an institution "controlled by a religious organization," we find that such exemption language has been contained in related and predecessor statutory schemes since at least 1982. (See, e.g., Stats. 1998, ch. 914, § 49 [former § 66271]; Stats. 1982, ch. 1117, § 1 [former § 221].) It is also apparent that the Legislature's language in granting the exemption was first taken from federal law, Title IX of the Education Amendments of 1972, exempting religious educational institutions from discriminating in programs and activities receiving federal financial assistance. (20 U.S.C. § 1681(a)(3) ["this section shall not apply to an educational institution which is controlled by a religious organization if the application of this subsection would not be consistent with the religious tenets of such organization"]; see Corporation of the Presiding Bishop v. Amos (1987) 438 U.S. 327, 334, hereafter Amos.)
The Act itself describes how its provisions, including section66270.5, are to be interpreted. Subdivision (g) of section66252 states:
 "It is the intent of the Legislature that this chapter shall be interpreted as consistent with Article 9.5 (commencing with Section 11135) of Chapter 1 of Part 1 of Division 3 of Title 2 of the Government Code, Title VI of the federal Civil Rights Act of 1964 (42 U.S.C. § 1981, et seq.), Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681, et seq.), Section 504 of the federal Rehabilitation Act of 1973 ( 29 U.S.C. § 794(a)), the federal Individuals with Disabilities Education Act (20 U.S.C. § 1400
et seq.), the federal Equal Educational Opportunities Act (20 U.S.C. § 1701, et seq.), the Unruh Civil Rights Act (Secs. 51 to 53, incl., Civ. C.), and the Fair Employment and Housing Act (Pt. 2.8 (commencing with Sec. 12900), Div. 3, Gov. C.), except where this chapter may grant more protections or impose additional obligations, and that the remedies provided herein shall not be the exclusive remedies, but may be combined with remedies that may be provided by the above statutes."
We have examined each of these state and federal statutes, administrative regulations implementing them, and court decisions interpreting them. Based upon this review, we believe certain general observations may be made as to the approach to be taken in interpreting the phrase "educational institution that is controlled by a religious organization."
First, there is no "bright line" test of what a "religious organization" is. (See McKeon v. Mercy Healthcare Sacramento (1998)19 Cal.4th 321, 325, hereafter McKeon; Amos, supra, 483 U.S. at p. 336; Killinger v. Samford University (11th Cir. 1997) 113 F.3d 196, 200, hereafter Samford; E.E.O.C. v. Townley Engineering Mfg. Co. (9th Cir. 1988) 859 F.3d 610, 618, hereafter Townley; Pime v. Loyola University of Chicago (7th Cir. 1986) 803 F.2d 351, 357 (conc. opn. of Posner, J.); Fike v. United Methodist Children's Home (E.D.Va. 1982) 547 F. Supp. 286,288-290, affd. (4th Cir. 1983) 709 F.2d 284, hereafter Fike; McClure v. Salvation Army (W.D. Ga. 1971) 323 F. Supp. 1100, 1104, affd. (5th Cir. 1972) 460 F.2d 553, cert. den. (1972) 409 U.S. 896, hereafter McClure.) Rather, all relevant factors must be considered in evaluating the "religious" character of an organization. (See McKeon, supra, 19 Cal.4th at p. 325; Amos, supra, 483 U.S. at p. 336; Samford, supra, 113 F.3d at p. 198; Townley, supra, 859 F.2d at p. 619.)
Factors considered relevant to such determination have included whether the organization was established and founded by a church or similar religious entity (see McKeon, supra, 19 Cal.4th at p. 323; Samford, supra, 113 F.3d at p. 119; Townley, supra, 859 F.2d at p. 618; Fike, supra, 547 F. Supp. at pp. 288-289), was organized under the Nonprofit Religious Corporation Law (see McKeon, supra, 19 Cal.4th at p. 325), is owned and operated by a church or similar entity (see McKeon, supra, 19 Cal.4th at p. 323; Amos, supra, 483 U.S. at p. 330; Samford, supra, 113 F.3d at p. 198; Townley, supra, 859 F.2d at p. 618; E.E.O.C. v. Mississippi College (5th Cir. 1980) 626 F.2d 477, 478, hereafter Mississippi), is affiliated with a church or similar religious entity (see Amos, supra, 483 U.S. at p. 330; Townley, supra, 859 F.2d at pp. 618-619; Fike, supra, 547 F. Supp. at p. 289), is associated with other religious organizations (see Samford, supra, 113 F.3d at p. 199), expresses a religious purpose and mission in its articles of incorporation, charter, bylaws, and other organizational documents (see McKeon, supra, 19 Cal.4th at p. 324; Samford, supra, 113 F.3d at p. 199; Townley, supra, 859 F.2d at p. 619), is nonprofit (see McKeon, supra, 19 Cal.4th at p. 325; Amos, supra, 483 U.S. at p. 330; Townley, supra, 859 F.2d at p. 619), is exempt from income taxes as a religious organization (see McKeon, supra, 19 Cal.4th at p. 324; Samford, supra, 113 F.3d at p. 199), receives financial support from a church or similar religious entity (see McKeon, supra, 19 Cal.4th at p. 324; Samford, supra, 113 F.3d at pp. 199-200; Townley, supra, 859 F.2d at p. 619), requires that its trustees follow specific religious tenets (see Samford, supra, 113 F.3d at p. 199; Townley, supra, 859 F.2d at p. 618; Fike, supra, 547 F. Supp. at pp. 289-290), requires that its faculty and staff follow specific religious tenets (see Samford, supra, 113 F.3d at pp. 198-199; Mississippi, supra, 626 F.2d at p. 479; McClure, supra, 323 F. Supp. at p. 1102), conducts religious services on its property (see McKeon, supra, 19 Cal.4th at p. 324; Samford, supra, 113 F.3d at pp. 198-199; Townley, supra, 859 F.2d at p. 619; Mississippi, supra, 626 F.2d at p. 479; Fike, supra, 547 F. Supp. at p. 289; McClure, supra, 323 F. Supp. at pp. 1101-1103), displays religious emblems and symbols on its property (see McKeon, supra, 19 Cal.4th at p. 324; Fike, supra, 547 F. Supp. at p. 289), provides religious training on its property (see Samford, supra, 113 F.3d at p. 198; Mississippi, supra, 626 F.2d at p. 479; Fike, supra, 547 F. Supp. at pp. 289-290; McClure, supra, 323 F. Supp. at p. 1101), uses its resources for religious endeavors (see Townley, supra, 859 F.2d at p. 619; Fike, supra, 547 F. Supp. at p. 290), and promotes and encourages a belief in specific religious tenets (see Amos, supra, 483 U.S. at p. 337; Townley, supra, 859 F.2d at p. 619; Fike, supra, 547 F. Supp. at pp. 289-290; McClure, supra, 323 F. Supp. at pp. 1101-1102).
No single factor or combination of factors described above is necessarily conclusive (see McKeon, supra, 19 Cal.4th at p. 325); rather, "[a]ll significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious" (Townley, supra, 859 F.2d at p. 618). Each situation must be evaluated depending upon all the particular facts involved.
Finally, we note that under the terms of section 66270.5, a postsecondary educational institution controlled by a religious organization is only exempt from the prohibition of section 66270
to the extent that the prohibition is inconsistent with its religious tenets.
We conclude in answer to the question presented that a postsecondary educational institution that is not directly owned or operated by a church or similar religious entity but rather by a nonprofit, tax exempt organization governed by an independent board of trustees under policies which follow specific religious tenets is exempt from the requirements of the Act when a commitment to a religious purpose is manifest in its mission, as demonstrated by such traits as its historical origins, charter and bylaws, affiliations with a church or similar religious entity, and tax exempt status.
[1] All references hereafter to the Education Code are by section number only.