Georgette **SPEER** and the Texas
Commission on Human
Rights, Petitioners,

v.

**PRESBYTERIAN CHILDREN'S HOME
AND SERVICE AGENCY,**
Respondents.

No. D–2170.

Supreme Court of Texas.

Feb. 3, 1993.

Brooks W. Conover, III, Austin, Kenneth
H. Molberg, Dallas, Dan Morales, Kathy
Wilson, Austin, for petitioners.

Mia M. Martin, Stephen F. Fink, Dallas,
for respondents.

OPINION

CORNYN, Justice.

We granted the writ of error in this case
to decide whether the Presbyterian Chil-
dren's Home and Service Agency ("the
Agency") is a religious corporation exempt-
ed from the general prohibition of discrimi-
natory hiring practices contained in the
Texas Commission on Human Rights Act
("the Act").[1] TEX.REV.CIV.STAT. art. 5221k

---

1. Certain employers are exempt from the gener-
al prohibition against discrimination:
This article does not apply to:
(1) the employment of an individual of a par-
ticular religion by a religious corporation, as-
sociation, or society to perform work connect-

ed with the performance of religious activities
by the corporation, association, or society....
TEX.REV.CIV.STAT.ANN. art. 5221k § 5.06(1) (Ver-
non 1987). In 1989, the Act was amended to
include under the category of "Nondiscrimina-
tory Practices" the following:

§ 5.01 (Vernon 1987).[2] However, at oral argument the Agency urged us to dismiss this case as moot, arguing that no live controversy exists between it and Speer. We agree. Accordingly, without reference to the merits, we vacate the judgment of the court of appeals and of the trial court, and dismiss this case as moot. *See Guarjardo v. Alamo Lumber Co.*, 159 Tex. 225, 317 S.W.2d 725, 726 (1958).

The Agency is a nonprofit Texas corporation founded by and affiliated with the Presbyterian church. In 1988, when Georgette Speer applied for the position of senior adoption worker at the Agency, it provided child care and adoption services to needy children. During a job interview, Speer identified herself as Jewish; an employee for the Agency informed Speer that it had a policy of hiring only Christians.

The day after the interview, Speer completed the Agency's employment application, which included the following question: "Do you feel that you can serve without reservation in this Agency, which is operated by the Presbyterian church, if you are not a Presbyterian?" Speer answered "Yes." On June 8, 1988, Speer was sent a rejection letter informing her that the Agency hired only Christians.[3]

Speer then filed a claim of unlawful discrimination with the Texas Commission on Human Rights ("TCHR"). After investigating her claim, TCHR brought suit against the Agency for violating the Texas Commission on Human Rights Act. Speer also brought a suit for injunctive relief against the Agency. After a bench trial on the consolidated cases, the district court rendered judgment for the Agency, holding that it fell under the statutory exception for religious organizations. The court of appeals affirmed the judgment of the trial court. 824 S.W.2d 589 (1991). Both Speer and TCHR filed separate applications for writ of error to this court.

When this case was argued on October 6, 1992, the attorney representing the Agency informed us that the controversy upon which this case is based was moot and sought dismissal of this appeal. Both the Attorney General, representing the TCHR, and Speer's attorney disagreed. Contrary to the dissenting justices' contention, all parties have filed post-submission briefs, which reveal no factual dispute on the issue of mootness.

Speer seeks solely injunctive and declaratory relief; and although the Act specifically allows for compensatory relief when requested and proven, Speer seeks no money damages. Tex.Rev.Civ.Stat.Ann. 5221k, § 7.01(d)(1) (Vernon 1987). Additionally, effective January 31, 1992, the Agency withdrew from offering adoption services entirely and the Senior Adoption Worker position originally sought by Ms. Speer has been abolished. Under these circumstances, we conclude this appeal should be dismissed as moot. *See General Land Office v. Oxy U.S.A., Inc.*, 789 S.W.2d 569, 570 (Tex.1990); *Fireman's Ins. Co. v. Burch*, 442 S.W.2d 331, 333 (Tex.1968).[4]

---

Notwithstanding any other provision of this article, it is not an unlawful employment practice:
(2) for a religious corporation, association, society, or educational institution or an educational organization operated, supervised, or controlled, in whole or in substantial part, by a religious corporation, association, or society to limit employment or give preference to members of the same religion.
Acts 1989, 71st Leg., ch. 1186, § 16, eff. Sept. 1, 1989 (current version at Tex.Rev.Civ.Stat.Ann. art. 5221k § 5.07(a)(2) (Vernon Supp.1993)).

**2.** This section of the Act provides:
It is an unlawful employment practice for an employer:
(1) to fail or refuse to hire or to discharge an individual or otherwise to discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment because of race, color, handicap, religion, sex, national origin, or age; or
(2) to limit, segregate, or classify an employee or applicant for employment in a way that would deprive or tend to deprive an individual of employment opportunities or otherwise adversely affect the status of an employee because of race, color, handicap, religion, sex, national origin, or age.

**3.** There is no dispute that Speer's nonreligious credentials qualified her for the position.

**4.** The dissenting justices aver that discrimination claims do not become moot when the employer stops the allegedly illegal hiring practices. 847 S.W.2d at 243 (Doggett, J., dissenting). In each of the cases cited by the dissent, the

At trial, Speer sought an injunction compelling the Agency to "hire the most qualified person for that particular position" and declaratory relief. In *McKie v. Bullock*, 491 S.W.2d 659, 660 (Tex.1973), we stated that when the action sought to be enjoined is accomplished and "suitable coercive relief" becomes impossible, it is improper to grant declaratory relief. The Fifth Circuit has agreed with this conclusion in a case construing the federal counterpart of the Act. *See Landgraf v. USI Film Prods.*, 968 F.2d 427, 432 (5th Cir. 1992) (holding that there is no right to declaratory relief for purposes of vindication).

■ The dissent offers two arguments why we should not dismiss this case as moot. The first argument relates to the merits of the case, in which the dissent claims that dismissal "endors[es] ... evasion of our state prohibition against employment discrimination." *infra* 847 S.W.2d at 242 (Doggett, J., dissenting). We do nothing of the kind. Dismissal for mootness is not a ruling on the merits. Rather, the court's duty to dismiss moot cases arises from a proper respect for the judicial branch's unique role under our constitution: to decide contested cases. Under our constitution, courts simply have no jurisdiction to render advisory opinions. TEX. CONST. art. II, § 1. Furthermore, it is hard to understand why the dissent would insist that this case remains alive when all of the requested relief has been foreclosed by the very change in circumstances the Act was designed to achieve: a party has ended the allegedly illegal hiring practice.[5]

■ The dissenting justices also argue that Speer's claim for attorneys fees prevents this case from being moot, citing our decision in *Camarena v. Texas Employment Commission*, 754 S.W.2d 149 (Tex.

1988). *Camarena* was a class action by farm workers who sued to challenge the constitutionality of the agricultural exemption in the Texas Unemployment Compensation Act (TUCA). The trial court granted the declaratory relief sought, but found that sovereign immunity barred the requested award of attorneys fees. Later that year, the Texas Legislature amended the TUCA to provide farm workers with unemployment coverage. Consequently, the trial court modified its judgment, holding the new amendment constitutional and enjoining enforcement of the former statute. The Texas Employment Commission appealed, contending that the amendment mooted the case. In response, the farm workers complained that the trial court erred in refusing to award attorneys fees. The court of appeals held that the trial court's judgment was indeed moot, and that the attorneys fees were barred by sovereign immunity, but we reversed the court of appeals' judgment, holding that the prevailing farm workers' claim for attorneys fees prevented the case from being moot.

Here, the dissent would hold that although a party has lost in the trial court and on appeal, the possibility that Speer and TCHR *might* prevail in their claim that the Agency is not a religious corporation in this court and overcome the Agency's other defenses on remand keeps the controversy alive. This argument ignores the fact that Speer, who seeks *only* injunctive and declaratory relief, can *never* show her entitlement to such relief because the position of Senior Adoption Worker no longer exists and the Agency no longer performs adoption services. Speer sought no money damages because, as she testified, "I did not lose any money." Because, as we have explained, injunctive and declaratory relief

defendant ceased its illegal conduct but continued operations, thus making the threat of future illegal conduct real. In this case, however, the defendant has discontinued providing adoption services entirely, thereby rendering futile the requested injunctive relief even if Speer were ultimately to prevail. The cases cited in support of the dissent's contention are, therefore, inapposite. *See e.g., Rowe v. General Motors Corp.,*

457 F.2d 348 (5th Cir.1972); *Parham v. Southwestern Bell Tel. Co.,* 433 F.2d 421 (8th Cir. 1970); *Local 53 v. Vogler,* 407 F.2d 1047 (5th Cir.1969); *Jenkins v. United Gas Corp.,* 400 F.2d 28 (5th Cir.1968).

5. The dissent obliquely adverts to racial discrimination, *infra* 847 S.W.2d at 243, but there is no such allegation in this case.

are unavailable, Speer could never be a prevailing party entitled to such relief under the Act, even on retrial, and is thus not entitled to recover her attorneys fees and costs. *See* TEX.REV.CIV.STAT.ANN. art. 5221k § 7.01(e) (Vernon 1987).

Accordingly, without reference to the merits, we vacate the judgment of the court of appeals and of the trial court, and dismiss this case as moot.

Concurring opinion by GONZALEZ, J.

Dissenting opinion by DOGGETT, J., joined by GAMMAGE, J.

GONZALEZ, Justice, concurring.

I agree with the Court's opinion and judgment. However, I write today solely to refute the petitioner's argument that "Christianity" is not a religion and to respond to the dissent. The dissent ignores the facts to remake this case into a challenge of employment discrimination for all positions within the Presbyterian Children's Home and Service Agency ("the Agency"). The dissent even interjects statements regarding race and sex discrimination, which have no application to this case. Additionally, without identifying a legal standard that is any different from the legal standard utilized by the lower courts, the dissent ignores the constitutional limits of our authority, disregards the extensive findings of fact made by the trial court, reweighs the evidence, and astonishingly concludes that this church-affiliated agency whose express purpose is to provide a variety of Christ-centered child care services is a secular agency.[1]

---

**1.** The dissent states: "Mootness is a judicial roadblock used here to prevent Georgette Speer and the Texas Human Rights Commission from ever having an opportunity to hold an employer accountable for undisguised discrimination." 847 S.W.2d at 245 (Doggett, J., dissenting). This statement insinuates that the rejection of Speer's and the Commission's claim by both lower courts was erroneous. They did exercise their right to hold the Agency accountable and they lost in both lower courts.

**2.** One of the defenses the Agency asserted at trial was that Ms. Speer was not the best qualified applicant for the position. The Agency had

Facts

The Agency was chartered in 1904. The articles of incorporation state that its mission is to provide Christ-centered child care services which minister to the spiritual, physical, intellectual, emotional, and social needs of dependent, neglected, and disturbed children and their families. At the time Georgette Speer filed this suit, the Agency operated children's homes in Itasca and San Antonio, a service agency in Dallas that offered adoptive and foster care services, and a service agency near Pharr that offered family life education services.

In April 1988, Ms. Speer applied for the position of senior adoption worker with the Agency's Dallas office. She did not get the job because the Agency had a policy of hiring only Christians.[2] Ms. Speer and the Texas Human Rights Commission filed suit against the Agency. The Agency asserted several affirmative defenses to this action, one of which was that it was a religious corporation exempt from the Texas Commission on Human Rights Act. Tex.Rev. Civ.Stat.Ann. art. 5221k (Vernon 1987).

After a bench trial, the trial court made the following findings of fact and conclusions of law:

*Findings of Facts*

4. The Agency[3] is a Texas non-profit corporation whose express purpose, as stated in its By–Laws, is to provide a variety of Christ-centered child care services which minister to the spiritual, physical, intellectual, emotional and social needs of dependent, neglected and disturbed children and youth, together

---

apparently decided that they had a particular need for an ethnic minority to fill this position. The Agency asserts that they hired a minority with credentials equal or superior to Ms. Speer's. The trial court made no findings on this defense since it was unnecessary to the disposition of the case.

**3.** The court of appeals and the trial court used the abbreviation "PCHSA" for Presbyterian Children's Home and Service Agency. In order to be consistent with the majority opinion, everywhere they used "PCHSA," we have used "the Agency."

with their families. These services shall be characterized by professional competence, as well as Christian concern, and reflect the flexibility and adaptability necessary to meet the needs of families in a rapidly changing world.

5. The Agency's purpose is further reflected in a formal covenant between the Agency and the Synod of the Sun, Presbyterian Church (U.S.A.) (hereinafter "Synod"), and its Restated Articles of Incorporation which state that the Agency is organized and shall be operated exclusively for religious, charitable and educational purposes, within the meaning of Section 501(c)(3) of the Internal Revenue Code. The Synod is a regional governing body of the Presbyterian Church (U.S.A.), Inc. which encompasses, serves and represents presbyteries and local Presbyterian churches in the geographical region of Arkansas, Louisiana, Oklahoma, and Texas.

6. The Internal Revenue Service ("IRS") has issued numerous rulings affirming the Agency's exempt non-profit, charitable, religious status, including a September 9, 1959, ruling that the Agency is exempt from federal income taxes because it is a religious and educational organization as described in Section 501(c)(3) of the Internal Revenue Code; a November 30, 1987 letter ruling that the Agency is organized and operates exclusively to carry out the purposes of the Synod within the meaning of Section 509(a)(3) of the Internal Revenue Code; and a March 19, 1987, National Office Ruling that the Agency is excused from filing annual Form 990 Information Returns because it is an "internally supported, church affiliated" organization within the meaning of Revenue Procedure 86–23, 1986–1 C.B. 564.

7. In furtherance of its expressed purpose, the Agency operates children's homes in Itasca and San Antonio, Texas; a service agency in Dallas, Texas which offers adoptive and foster care service; and a service agency near Pharr, Texas which offers family life education services. **The Agency has not wavered from its religious purpose since it was orga-** **nized in 1904** (emphasis added). The Agency's commitment to providing Christ-centered child care sets it apart from other secular agencies that provide similar services.

8. In 1989, the Agency's total receipts amounted to $2,076,732. Money from governmental sources comprised 5.64% of that total amount.

9. The majority of the Agency's funds are received from individual donors and from Presbyterian churches.

10. The children that the Agency serves in its various operations come from many sources, including private referrals and from the Department of Human Services.

11. All applicants for the position of Senior Adoption Worker complete an application for employment that requests information on religious background. The Agency does not hire persons for the position of Senior Adoption Worker who do not adhere to the Christian religion. Further, the Agency's personnel policies include a statement of Christian commitment that the Agency requires of its employees, and each employee signs an acknowledgement of this information and has an opportunity to discuss the policies with his or her supervisor.

12. The Agency depends upon its adoption and foster workers to carry out its avowed charitable and religious purposes. According to the Agency, the primary link between the Agency and prospective adoptive parents, Senior Adoption Workers must be professed Christians, who possess a Christian commitment and concern for troubled youths and their families, in order to adequately fulfill the Agency's purpose and goals. Senior Adoption Workers screen and evaluate prospective families to ensure their suitability to become adoptive families. One absolute criteria for suitability used by the Agency is that both husband and wife be church-oriented and active in the same Christian church. Although persons who are not Christians could assess a prospective foster or adoptive family's appropriateness from a secular

standpoint, they could not, according to the Agency, adequately evaluate the family's Christian commitment. Senior Adoption Workers perform work connected with the religious activities of the Agency.

13. Prospective adoptive and foster parents must sign an Agency Statement of Faith, which sets out the Agency's mission statement and testifies to the prospective parents' Christian faith. The staff member working with the family must also sign the Statement of Faith. Based upon the language set forth in the Statement, it is evident that only those persons who adhere to the Christian religion can truthfully sign the Statement of Faith.

14. Speer testified that she does not know what the Christian religion is and does not believe Christianity is a religion.

15. Speer also stated that she does not understand the concept of Christ-centered child care or the notion of distinctively Christian relationships.

16. Speer further testified that she does not believe in the statements contained in the Statement of Faith that the Agency requires all prospective parents to sign along with the Adoption Worker who is working with them.

### Conclusions of Law

1. This Court has jurisdiction of the parties and the subject matter under the Texas Commission on Human Rights Act ("TCHRA"), Tex.Rev.Civ.Stat.Ann. art. 5221k § 1.01 et seq. (Vernon Supp.1990).

2. The TCHRA specifically allows religious corporations to "limit employment ... to members of the same religion." *Id.* Section 5.07(a)(2). The TCHRA further defines religion as "all aspects of religious observance and practice as well as belief...." *Id.* Section 2.01(14).

3. Defendant Agency is an "employer" within the meaning of the TCHRA. *Id.* Section 2.01(7).

4. Texas courts have had little opportunity to interpret the provisions of the TCHRA; thus, it is appropriate to seek guidance from cases decided under Title VII of the Civil Rights Act of 1964 (hereinafter "Title VII"), 42 U.S.C. § 2000e *et seq. See Elstner v. Southwestern Bell Tel. Co.,* 659 F.Supp. 1328, 1345 (S.D.Tex. 1987). Indeed the Texas Legislature stated that one of the general purposes of the TCHRA is "to provide for the execution of the policies embodied in Title VII...." Tex.Rev.Civ.Stat.Ann. art. 5221k § 1.02(1).

5. When determining whether an entity is a religious organization, both the Equal Employment Opportunity Commission ("EEOC") and the courts consider the character of the corporation, whether the corporation was created to serve a religious purpose, and whether its purpose has remained the same. *EEOC v. Townley Eng'g and Mfg. Co.,* 859 F.2d 610, 618–619 (9th Cir.1988); *McClure v. Salvation Army,* 460 F.2d 553, 558–60 (5th Cir.), *cert. denied,* 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972); *EEOC Decision 75–192,* CCH EEOC Dec. Section 6558 (Feb. 21, 1975). Federal courts have also recognized that religious activities of a religious organization do not lose this special status merely because the activity holds some interest for persons not members of the faith, or occupies a position of respect in the secular world at large. *Feldstein v. Christian Science Monitor,* 555 F.Supp. 974, 977–78 (D.Mass.1983).

The Agency's evidence established that it was organized and is exclusively operated for religious, charitable, and educational purposes; that this purpose has not changed over the years and that it receives the overwhelming majority of its funding from Presbyterian churches and individual church members. Further, the IRS has repeatedly recognized the Agency's status as a religious charitable organization. Thus, the Agency is a "religious corporation" within the meaning of the TCHRA. Accordingly, the Agency did not unlawfully discriminate against Speer, because the TCHRA does not apply to the Agency in its employment of Senior Adoption Workers. TCHRA, Sections 5.06(1), 5.07(a)(2).

The dissent cannot ignore the findings of fact made by the trial court. We must give findings of fact by the trial court great deference. Under our rules of procedure, an appellate court cannot disregard findings of fact—the appellate court can only deviate from such findings if there is no evidence to support the findings.[4] The dissent, however, does not even purport to engage in any type of "no evidence" analysis. Any attempt to state that the lower courts applied an incorrect legal standard is a mere pretext enabling the dissenting justice to improperly substitute his views of the evidence for that of the lower courts.

Both the trial court and the court of appeals looked to federal case law for guidance and concluded that the Agency's "primary purpose and character are religious in nature." 824 S.W.2d 589, 596. They held that as a matter of law, the Agency did not illegally discriminate against Ms. Speer. We accord the lower courts' analysis and application of the appropriate law less deference than their pronouncements as to the facts. An erroneous conclusion of law by the lower courts is not binding on this Court. However, the "law" relied on the lower courts to conclude that the agency in question was a religious corporation is the same body of federal case law relied on by the dissent. The dissent disagrees with the lower courts' conclusion that the Agency did not unlawfully discriminate against Ms. Speer but offers little in the way of explanation or analysis.

### Question of Law or Question of Fact?

Is the status of an agency, whether it is religious or secular, a question of fact or a question of law? The dissent treats this as an issue of law. I believe that in the case before us, it is a question of fact. If the underlying facts are disputed, the question is usually a fact issue. When we addressed whether a church camp was a "place of religious worship," and thus exempt from ad valorem taxation, we concluded, "What constitutes an actual place of religious worship as those words are used in the Constitution and statutes is a fact issue." *Davies v. Meyer*, 541 S.W.2d 827, 829 (Tex.1976). *See also Kerrville Indep. Sch. Dist. v. Southwest Tex. Encampment Ass'n*, 673 S.W.2d 256, 260 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.). Determining whether an entity is a "religious corporation" is an inquiry that closely mirrors that for determining whether a property is a place of religious worship. Unless the facts conclusively establish the status of the entity in question, the question is one of "fact." Because the trial court here acted in its capacity as factfinder in finding that the Agency is a religious corporation, this Court can only look to see whether there is some evidence to support this finding.

The lower courts did not make their decision in a vacuum. Based on the record before it, the court of appeals agreed with the trial court that the Agency is a religious corporation. They framed their answer to the inquiry of whether the Agency was a secular or a legal corporation as a legal conclusion. Whether this is a pure question of "fact" or of "law" or whether it is a mixed question of law and fact, under the facts of this case, the answer is the same. Either as a question of law or fact, balancing the eight relevant factors described in this opinion, giving due deference to the religious aspects of the organization, the evidence is overwhelming that the Agency is a religious corporation. Without any examination or inquiry, the dissent implies that as a matter of law, this Christ-centered Presbyterian Agency is a secular agency.

### ANALYSIS

This is the first case to reach our court inquiring about the scope of the religious

---

4. Tex.R.Civ.P. 299 provides: "When findings of fact are filed by the trial court they shall form the basis of the judgment...." Thus, the trial court's findings of fact are entitled to the same weight and consideration on appeal as a jury verdict. *See Heard v. City of Dallas*, 456 S.W.2d 440, 443 (Tex.Civ.App.—Dallas 1970, writ ref'd n.r.e.). When there is evidence of probative force to support the findings and the judgment of the trial court, such findings will not be disturbed even though the evidence is conflicting and the reviewing court may have concluded otherwise. *Corn v. Texas Joint Stock Land Bank*, 131 S.W.2d 752, 759 (Tex.Civ.App.—Fort Worth 1939, writ ref'd).

corporation exemption found in section 5.06(1) of the Act, which provides an exception for "the employment of an individual of a particular religion by a religious corporation, association, or society to perform work connected with the performance of religious activities by the corporation, association, or society." TEX.REV.CIV.STAT.ANN. art. 5221k § 5.06(1) (Vernon 1987). The Agency had to meet three requirements to utilize the section 5.06(1) exemption. First, the Agency had to establish that it was a religious corporation. Second, the Agency had to demonstrate that a senior adoption worker was responsible for work connected with the performance of its religious activities. Finally, the Agency had to show that it denied employment to an individual of a particular religion. I will examine each of the requirements individually.[5]

### The Status of the Agency as a Religious Corporation

The Agency first must establish its status as a religious corporation to be entitled to the section 5.06(1) exemption. Because of the similarity between section 5.06(1) and the federal exemption to Title VII,[6]

federal case law provides guidance in construing the meaning of the term "religious corporation." [7]

Most federal courts use a balancing test to determine whether an entity is a religious corporation. "[E]ach case must turn on its own facts. All significant religious and secular characteristics must be weighed to determine whether the corporation's purpose and character are primarily religious." *EEOC v. Townley Eng'g & Mfg. Co.*, 859 F.2d 610, 618 (9th Cir.1988), *cert. denied*, 489 U.S. 1077, 109 S.Ct. 1527, 103 L.Ed.2d 832 (1989) (emphasis added); *see also EEOC v. Kamehameha Sch./Bishop Estate*, 780 F.Supp. 1317, 1324 (D.Haw.1991) ("the court is required to use a balancing test to determine whether [the entity] is exempt").

In making this determination, courts should give deference to the religious aspects of the organization. The United States Supreme Court clearly articulated the policy behind this deference in *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter-Day Saints v. Amos*, 483 U.S. 327, 107 S.Ct.

---

5. The Agency also urged its entitlement to an exemption under section 5.07(a)(2) of the Act, which provides that it is not an unlawful employment practice "for a religious corporation, association, society, or educational institution ... to limit employment or give preference to members of the same religion." TEX.REV.CIV. STAT.ANN. art. 5221k § 5.07(a)(2) (Vernon Supp. 1992). Therefore, an exemption under section 5.07(a)(2) would only require that the Agency establish that it is a religious corporation and that it limited employment to members of the same religion. The Agency would not be required to establish that the position of senior adoption worker is connected with its religious activities.

However, the Agency possessed a problem relying on section 5.07(a)(2) because prior to September 1, 1989 the exemption was only applicable to religious educational institutions. Texas Commission on Human Rights Act, 68th Leg., 1st C.S., ch. 7, § 5.07, 1983 Tex.Gen.Laws 37, 48 (codified as amended at TEX.REV.CIV.STAT. ANN. art. 5221k § 5.07(a)(2)) (Vernon Supp. 1992). Thus, in 1988, when the Agency denied Ms. Speer employment, section 5.07(a)(2) would not have aided the Agency. On the other hand, by the time the case went to trial on June 26, 1990, section 5.07(a)(2) had been amended to apply to all religious corporations. The Agency urges that the amended version of section

5.07(a)(2) is applicable to this action since the trial judge relied upon the amended section and neither side objected. While I note that the Agency's argument possesses some merit, it is unnecessary to determine the applicability of section 5.07(a)(2) in this case because section 5.06(1) provided an independent basis to affirm the judgment of the court of appeals.

6. The federal exception to the Title VII prohibition against discrimination provides:

> The subchapter shall not apply to ... a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities.

42 U.S.C. § 2000e-1.

7. In fact, the purpose of the Texas Commission on Human Rights Act was to provide for the execution of the policies embodied in Title VII of the Federal Civil Rights Act of 1964. *See* TEX.REV.CIV.STAT.ANN. art. 5221k § 1.02(1). Thus, federal jurisprudence provides guidance to the interpretation of all sections of the Texas Act unless the Texas Legislature deviated from the language of Title VII.

2862, 97 L.Ed.2d 273 (1987), where the Court upheld the firing of two non-Mormon employees from a gym that was open to the public but owned by the Church of Latter Day Saints. The Court noted that the exemption to Title VII has the "legitimate purpose of alleviating significant governmental interference with the ability of religious organizations to define and carry out their religious missions." *Id.* at 339, 107 S.Ct. at 2870. Furthermore, "the statute effectuates a more complete separation of the two [church and state] and avoids ... intrusive inquiry into religious belief." *Id.* The Court also determined that an inquiry into the religious nature of an organization should be avoided because "it is a significant burden on a religious organization to require it, on pain of substantial liability, to predict which of its activities a secular court will consider religious." *Id.* at 336, 107 S.Ct. at 2868. The legislative history of the Texas Commission on Human Rights Act also evidences an intent to give due deference to the religious aspects of an organization. *See* HOUSE STUDY GROUP DAILY FLOOR REPORT, Tex.H.B. 14, 68th Leg., 1st C.S. (June 25, 1983) ("The bill would not apply to religious employment...."); TEX.REV.CIV.STAT.ANN. art. 5221k § 1.02(1) (Vernon Supp.1992–93) (purpose of the Texas Commission on Human Rights Act is to provide for execution of the policies embodied in Title VII of the Federal Civil Rights Act of 1964).

Balancing all significant religious and secular characteristics of the Agency, and giving due deference to the religious aspects of the organization, the trial court and the court of appeals concluded that the Agency is a religious corporation. In making this determination the court of appeals examined eight relevant factors that have been identified by various federal courts. The underlying inquiry is a balancing test, which examines whether the primary purpose and character of the entity are religious while maintaining the proper deference for the religious aspects of the entity.

The eight factors distilled by the court of appeals from several federal decisions are helpful in making this determination, but they are not necessarily dispositive or ex-

clusive. Thus, an entity need not meet all these factors to be considered a religious corporation; instead, the entity must, on the balance, have a primary purpose and character that is religious.

The eight factors are as follows:

1) whether the entity operates for profit or as a nonprofit organization, *Townley,* 859 F.2d at 619;

2) whether an administrative agency has determined the entity's status, *Feldstein v. Christian Science Monitor,* 555 F.Supp. 974, 978 (D.Mass.1983);

3) whether the entity's articles of incorporation or other pertinent documents state a religious purpose, *Townley,* 859 F.2d at 619; *Feldstein,* 555 F.Supp. at 977;

4) whether the entity represents itself to the church, the public, and the government as a secular or sectarian body, *Fike v. United Methodist Children's Home,* 547 F.Supp. 286, 289–290 (E.D.Va.1982), *aff'd,* 709 F.2d 284 (4th Cir.1983);

5) whether the church is intimately involved in the management, day-to-day operations, and the financial affairs of the entity, *Feldstein,* 555 F.Supp. at 977;

6) whether the church supports or is affiliated with the entity, *Townley,* 859 F.2d at 619; *Feldstein,* 555 F.Supp. at 977;

7) whether the entity adheres to or deviates from an original religious purpose, *Fike,* 547 F.Supp. at 290; and

8) whether the entity conducts religious activities, services, or instruction, *Fike,* 547 F.Supp. at 289–90.

I will briefly discuss each of these factors in turn as they relate to the lower courts' conclusion that the Agency is a religious corporation.

### Profit v. Nonprofit

It is undisputed that the Agency operates as a non-profit organization.

### Agency Determinations

The Internal Revenue Service has issued numerous rulings affirming the Agency's exempt non-profit, charitable, and religious

status, including a September 9, 1959 ruling that the Agency is exempt from federal income taxes because it is a religious and educational organization as described in section 501(c)(3) of the Internal Revenue Code ("I.R.C."); a November 30, 1987 letter ruling that the Agency is organized and operates exclusively to carry out the purposes of the Synod of the Sun within the meaning of section 509(a)(3) of the I.R.C.; and a March 19, 1987 National Office ruling that the Agency is excused from filing annual Form 990 Information Returns because it is an "internally supported, church affiliated" organization *within the meaning* of Revenue Procedure 86–23, 1986–1 C.B. 564.

### Statement of a Religious Purpose

The Agency's articles of incorporation, as well as other documents, state that its purpose is to provide a variety of Christ-centered child care services characterized by professional competence and Christian concern. While such statements might be considered self-serving, the trial court, as previously noted, found that the Agency has not deviated from the purpose embodied in its articles of incorporation and this finding was not challenged on appeal.

### Representations of its Nature

An organization must represent itself to its members, the public, and the state as a sectarian organization to avail itself of the status of religious corporation. That the Agency represents itself to all aspects of society as a religious organization is evidenced, if nothing else, by its name. Additionally, as the facts of this case demonstrate, the Agency makes clear to applicants that because of its religious mission it only hires Christian senior adoption workers.

The dissent argues that a problem arises here, though, because the Agency signed a contract with the Texas Department of Human Services ("DHS") which provides that the Agency would not discriminate on the basis of religion in its hiring practices. However, as the court of appeals correctly pointed out,

The Agency was not inconsistent in its representations regarding its religious nature. No direct evidence of any attempt by the Agency to hide its religious nature from DHS was before the court. DHS was aware of the Agency's policy regarding employment.

824 S.W.2d at 594.

In signing the contract, the Agency merely agreed that it would not engage in any illegal discrimination, that is, in discrimination that was not exempt by the legislature. Furthermore, the parties presented no evidence that the Agency attempted to conceal its religious nature from DHS, nor that DHS was unaware of the Agency's affiliation with the church. The name of the organization itself refutes any contrary conclusion.

### Involvement of Church in Day-to-Day Operations

Although the Synod of the Sun does not exercise day-to-day control over the operations of the Agency, the Synod possesses the power to exercise such control if it wishes to do so. The Agency is a corporation affiliated with the regional governing body of the Presbyterian Church. The Restated Articles of Incorporation of the Agency provide that the Synod of the Sun shall determine the manner of election, term of office, number, and qualifications of the Board of Trustees, as well as the method and cause for removal of such trustees. The Synod of the Sun possesses the power to periodically evaluate the operations of the Agency and receives an annual report relating to the activities of the Agency. Upon dissolution of the Agency, all of its assets will be distributed to the Synod of the Sun. The Synod of the Sun possesses the power to periodically evaluate the operations of the Agency and receives an annual report relating to the activities of the Agency. Thus, the Synod is somewhat involved in the management of the Agency.

### Church Affiliation

The Presbyterian Church both supports and affiliates itself with the Agency. The

Agency uses the name of the Presbyterian Church. Furthermore, the Agency must demonstrate to the Synod of the Sun that it succeeds in its mission to provide Christ-centered child care in order to continue being classified as a Presbyterian organization. The Presbyterian approval implies the church's recognition of the Agency as carrying out a primarily religious activity.

On the financial side of the ledger, it is undisputed that the Synod provides funding for the Agency. Additionally, the Agency is heavily funded by members of the Presbyterian Church. Just as a church receives the majority of its funding from individuals because they believe its religious underpinnings, so does the Agency receive the majority of its funds from individuals and churches supporting its religious mission.

No Deviation from Religious Purpose

To be a religious corporation, an entity must actually act to further its religious purpose. In *Farnam v. CRISTA Ministries*, 116 Wash.2d 659, 807 P.2d 830, 838 (1991), the Washington Supreme Court held that a nursing home owned by CRISTA was a religious corporation, based in part because the nursing home and CRISTA adhered to their religious mission statements. In a similar case, a court held that the Christian Science Monitor was a religious organization in part because its declared purpose is to further the tenets of the Christian Science faith. *Feldstein*, 555 F.Supp. at 978. The court so held despite the fact that the "Monitor holds itself out as an objective and unbiased reporter of world news and events." *Id.* The court explained that an organization can still be a religious corporation even if its religious activities also entail secular activities:

> [A] religious activity of a religious organization does not lose that special status merely because it holds some interest for persons not members of the faith, or occupies a position of respect in the secular world at large.

*Id.*

The court buttressed its holding by noting that this determination involves questions of separation of church and state; the court emphatically stated that the courts should stay out of these kinds of disputes because it is "unwilling to involve the federal court in what is ultimately an internal administrative matter of a religious activity," namely, the hiring of employees. *Id.*

One of the earliest cases in this area granted the status of a religious corporation to the Salvation Army, in part because it fulfills its original mission statement. *McClure v. Salvation Army*, 323 F.Supp. 1100 (N.D.Ga.1971), *aff'd*, 460 F.2d 553 (5th Cir.), *cert. denied*, 409 U.S. 896, 93 S.Ct. 132, 34 L.Ed.2d 153 (1972).

In contrast, the court in *Fike* declined to recognize the United Methodist Home as a religious corporation on the grounds that the United Methodist Children's Home had deviated from its original purpose. "While the original mission of the Home was to provide a Christian home for orphans and other children, that mission has not remained unchanged." *Fike*, 547 F.Supp. at 290.

The Agency's articles of incorporation, and other documents, state that its purpose is to provide a variety of Christ-centered child care services characterized by professional competence and Christian concern. The undisputed fact that the workers at the Agency only place children in adoptive and foster homes where both parents are active Christians demonstrates that the Agency has not deviated from its original purpose. Furthermore, and most importantly, the trial court made a finding of fact that the Agency has not deviated from its original purpose, and this finding has not been challenged on appeal. Thus, this fact fundamentally distinguishes the present case from *Fike*.

Religious Activities

Both parties agree that the Agency does not provide religious instruction. However, the children are taken to Presbyterian churches as part of their life at the Agency. The lack of structured religious instruction does not diminish the fact that the Agency requires that adoptive and foster homes have two active Christian par-

ents who are committed to raising the children in a "Christian family environment." Neither does it diminish the fact that all of the employees are Christians, and that all prospective adoptive parents, as well as employees, are required to sign a Statement of Faith. The Agency might wish to have Christian employees because it hopes that children at an impressionable age will follow the example set by Christian workers. *Kamehameha*, 780 F.Supp. at 1323. Employees in a religious institution "by their presence and daily contact with students serve as role models and instruct them in morals.... [Their] role is one of teaching by example and precept." *Id.*

### Summary

After balancing all the factors with proper deference being afforded to the religious aspects of the entity, I conclude that there is some evidence that the agency is a religious corporation. The court of appeals affirmed the trial court's judgment to this effect and the court of appeals decision is conclusive on all questions of fact brought before them on appeal. TEX.CONST. art. V, § 6. Based on the record before us, the dissent's insinuation that there is no evidence that the agency is a religious corporation is patently absurd.

I now turn to the second prong of the section 5.06(1) exemption—whether the position of senior adoption worker entails work connected with the religious activities of the corporation.

### Religious Activities of the Senior Adoption Worker

Section 5.06(1) of the Texas Commission on Human Rights Act exempts a religious corporation's employment of an individual of a particular religion if the individual "perform[s] work connected with the performance of religious activities by the corporation." TEX.REV.CIV.STAT.ANN. art. 5221k § 5.06(1) (emphasis added). The exemption in Title VII provides that religious entities can employ individuals of a particular religion to perform work connected with the entity's activities. 42 U.S.C. § 2000e–1. Therefore, the federal statute does not require that the employee's work be connected with the entity's religious activities. Section 5.06(1) thus is more restrictive in this respect than the federal exemption. For this reason, federal case law does not aid us here.

To determine whether the work of a senior adoption worker is connected with the Agency's religious activities, we should examine the relationship between the worker's duties and the religious mission of the Synod of the Sun. Once again, we must engage in a balancing test, maintaining the proper deference to the religious aspects of the position.

Although senior adoption workers "performed no religious rituals," 847 S.W.2d at 241 (Doggett, J., dissenting), they are the primary link between the Agency and prospective adoptive parents. According to the Agency, senior adoption workers must be professed Christians who possess a Christian commitment and concern for troubled youths and their families in order to adequately fulfill the Agency's purpose and goals. Senior adoption workers screen and evaluate prospective families to ensure their suitability to become adoptive families. In turn, one absolute criteria for suitability utilized by the Agency is that both the husband and the wife be church-orientated and active in the same Christian church. The senior adoption worker must assess the couple's commitment to the Christian religion.

As previously indicated, prospective adoptive and foster parents must sign a Statement of Faith that sets out the Agency's mission statement and testifies to the prospective parents' Christian faith. The staff member working with the family must also sign the Statement of Faith. The language set forth in the statement, shows that only those persons who adhere to the Christian religion can truthfully sign it.

The Agency's mission is to provide a variety of Christ-centered child care services. Ms. Speer testified that she did not understand the concept of Christ-centered child care or the notion of distinctively Christian relationships. In fact, she also

testified that she does not know what the Christian religion is and she does not believe Christianity is a religion. Based on her own admissions, she could not carry out the purpose of the Agency. Ms. Speer and the Commission urge that the senior adoption worker position does not entail religious activities. They argue that the application for the position does not discuss the necessity of being Christian. While this is true, the application devotes half a page to five questions inquiring into the religious background of the applicant. Such questions combined with the name of the organization should alert the reasonable applicant that the Agency possesses some type of religion-based requirement. Furthermore, the Adoption Worker Purpose of Position, Qualifications, and Responsibilities Statement requires an applicant to have a reference from a minister. This adequately serves notice on the applicant that religious belief is a consideration in the employment decision.

Ms. Speer and the Commission also argue that many of the Agency's activities are also performed by secular organizations and entities. While this is true, "a religious activity of a religious organization does not lose that special status because it holds some interest for persons who are not members of the faith, or it occupies a position of respect in the secular world at large." *Feldstein*, 555 F.Supp. at 978. Just because child care services can be rendered in a secular manner does not mean that they cannot be rendered in a religious manner.

I therefore conclude that there is some evidence that the Agency's senior adoption worker position was connected with its religious activities.

### Individuals of a Particular Religion

The final requirement of section 5.06(1) is whether the Agency limited employment to members of a particular religion. Ms. Speer and the Commission argue that the Agency cannot utilize the section 5.06(1) exemption because it did not limit its hiring to individuals of a particular religion. The Agency limited employment based on whether the applicant was a Christian. Ms. Speer and the Commission argue that the Agency cannot limit employment to Christians—rather, it must limit employment to only Presbyterians or it cannot limit employment at all.

I disagree. The statute requires only that the employment is denied to an individual of a particular religion. Since Presbyterians are a denomination of the Christian religion, the Agency was well within the dictates of section 5.06(1) by limiting employment to members of the Christian religion.

A holding that Presbyterians are a subgroup of the Christian religion comports with federal case law and the plain meaning of the terms. The United States Supreme Court recently recognized that the Christian religion includes various denominations, such as Presbyterians. *Frazee v. Illinois Dep't of Employment Security*, 489 U.S. 829, 834, 109 S.Ct. 1514, 1517, 103 L.Ed.2d 914 (1989). The EEOC reached a similar decision in a case under Title VII where it held that a religious corporation who hired only Christians did not hire from more than one religion when it hired persons of different Christian denominations. *E.E.O.C. Dec. No. 75–186*, EEOC Decisions (CCH) ¶ 6553 (Feb. 21, 1975). In *Little v. Wuerl*, 929 F.2d 944, 950–51 (3d Cir.1991), the Third Circuit held that being of a particular religion encompassed more than just denominational affiliation.

These federal determinations are consistent with the plain meaning of the terms utilized in the Texas Commission on Human Rights Act. Religion is defined by the Act as "all aspects of religious observance and practice, as well as belief...." TEX. REV.CIV.STAT.ANN. art. 5221k § 2.01(14). The definition of "Christianity" is "the religion stemming from the life, teachings, and death of Jesus Christ...." WEBSTER'S THIRD INTERNATIONAL DICTIONARY 400 (1961) (emphasis added). In contrast, the definition of "Presbyterian" is "a Protestant **Christian** church...." *Id.* at 1792 (emphasis added). Thus, there is substantial authority that Christianity is the religion of Presbyterians, and therefore the Agency

complied with the requirement that it limit employment based on a particular religion.

Ms. Speer and the Commission also complain that the trial court and the court of appeals did not give the proper deference to the Commission's interpretation of the Act as expressed at trial by its Executive Director. The Director testified that Christianity is not a religion.[8] No deference need be given to such a patently erroneous opinion. The record does not show that the Commission nor its Director have special expertise or qualifications to determine what is or is not a religion. Whether something is a religion is probably a mixed question of law and fact that the trial court was entitled to decide.

Also, Ms. Speer and the Commission complain of the trial court's failure to rule on the bona fide occupational defense asserted by the Agency. However, such a ruling was rendered moot by the trial court's disposition of the case.

### Conclusion

The issue of relationships between Christians and Jews should be treated with tolerance, compassion, sensitivity, and care. Nonetheless, the legislature recognized that an adherent to a particular religion is likely to possess greater familiarity with its traditions and theology and thus exempted religious entities from the Texas Human Rights Act. The duly elected members of the body politic empowered to pass laws in this state, the legislature, and the dissenting justices recognize that "religious employers, to implement their purpose, must be able to select those employees who put into effect their religious tenets." 847 S.W.2d at 242, n. 2 (Doggett, J., dissenting). The dissent ignores this legislative mandate and proceeds to construe "religion" so narrowly as to include little more than "spiritual leaders of an organization." 847 S.W.2d at 242 n. 2 (Doggett, J., dissenting). Apparently, the dissent is of the view that the religious exemption means only that a Jewish congregation cannot be forced to hire a Baptist minister as their Rabbi, but that a secular court is going to decide whether an associate pastor, deacon, youth director, liturgist, etc., comes within the religious exception. This extreme and narrow interpretation guts the exemption and would have the disastrous effect of entangling government bureaucrats with the affairs of churches throughout the state. As previously noted, such interpretation of the religious exemption would facilitate and encourage significant governmental intrusion and interference with the ability of religious organizations to define and carry out their religious missions, and create significant burdens on religious organizations to predict, at the risk of substantial liability, which of its activities a secular court will consider religious.[9] Apparently, the dissenting justices do not share this concern.

In my opinion, there is some evidence that the Agency is a religious corporation, that the position of senior adoption worker was connected with the religious activities of the corporation, and that the Agency limited employment to individuals of a particular religion.

---

**8.** The dissent states that "such theological questions, which hardly require a dictionary for an answer ... are in no way germane to today's proceeding." 847 S.W.2d at 245 (Doggett, J., dissenting). The Commission and Ms. Speer disagree. Ms. Speer and the Director of the Commission both testified that Christianity is not a religion. Also, Ms. Speer testified that she did not understand the concept of Christ-centered child care and did not believe in the Statement of Faith that the Agency required all prospective parents to sign along with the Adoption Worker who is working with them. Both the Commission and Ms. Speer alleged in points of error before this Court that the court of appeals committed error in concluding that Christianity is a religion. This is hardly an irrelevant inquiry.

**9.** The dissent states that in construing the contours of the statutory religious exception, that I would interpret it so broadly that my "test would tear a major loophole in our state discrimination laws." 847 S.W.2d at 242 (Doggett, J., dissenting). First of all, the "test" attributed to me is clearly not my test. What I would do is as I noted in footnote 7. Since the purpose of the Texas Commission on Human Rights Act was to provide for the execution of the policies of Title VII of the Federal Civil Rights Act, I would look to federal jurisprudence for guidance and utilizing the eight relevant factors listed on p. 235 of this opinion, I would use a balancing test to determine whether an entity is a religious corporation.

Finally, the dissent disingenuously states that "the employer's attorney **announced** to this court that it engaged in wide-ranging discrimination ..." This "announcement" came in response to a question by Justice Doggett from the bench during oral argument. The legal issues on appeal are framed by properly preserved points of error, not by questions from the bench. Nonetheless, the inquiry is irrelevant. The only position challenged in this appeal is that of a senior adoption worker. As to other employees of the Agency, the version of the Act in existence at the time of this incident exempted a religious corporation's employment of an individual of a particular religion if the individual "performs work connected with the performance of religious activities by the corporation." TEX. REV.STAT.ANN. art 5221k § 5.06(1).

DOGGETT, Justice, dissenting.

> "Injustice anywhere is a threat
> to justice everywhere."

—Dr. Martin Luther King, Jr.
Letter from the Birmingham Jail
April 16, 1963

Should an employer who is challenged for purposefully discriminating based upon race, sex, or religion be permitted to avoid all responsibility for misconduct by simply abolishing the job in question? Certainly, the majority declares; indeed such a response advances what "the [Texas Commission on Human Rights] Act was designed to achieve." 847 S.W.2d at 229.

Can the employer delay such abolition until after trial, until after issuance of an opinion by the court of appeals; in fact, delay announcing the abolition until the morning of oral argument before the Texas Supreme Court, over three years after the discriminatory conduct occurred? Can such belated employer conduct defeat any claim for attorney's fees incurred by the victim of discrimination and any claim for declaratory relief sought by the state agency charged with enforcing our equal employment opportunity laws? Once again the majority offers unqualified affirmative answers. Because these answers will thwart efforts to prevent all forms of employment discrimination in Texas, I dissent.

With the enactment of the comprehensive Texas Commission on Human Rights Act, Tex.Rev.Civ.Stat.Ann. art. 5221k (Vernon 1987), the Legislature strongly declared Texas public policy in favor of equal employment opportunity by forbidding practices that "adversely affect [persons] ... because of race, color, handicap, religion, sex, national origin, or age." Id. at § 5.01(2). The clear objective of this remedial act is "to secure for persons within the state freedom from discrimination ... and thereby to protect their interest in personal dignity." Id. § 1.02(2).

It is undisputed that Georgette Speer was denied employment because of her religion. The Agency's published job description for the position she sought contained no religious requirements, and such employees performed no religious rituals. The employer to whom she applied had, moreover, specifically pledged to refrain from religious discrimination in its contract with the Texas Department of Human Services.[1] Likewise, in its employee handbook, the employer professed a commitment to equal opportunity. In direct conflict with these representations, the employer's attorney announced to this Court that it engages in wide-ranging discrimination, applying its policy of exclusion not

---

**1.** Now the employer seeks to avoid this public commitment to nondiscrimination by claiming that its agreement was limited to an empty promise—it was only pledging to comply with statutes from which it was exempt as a religious corporation. The record does not support this circular argument. The contract requires compliance with federal and state equal employment opportunity regulations that contain no exception for religious employers. See Exec.Order No. 11246, 3 C.F.R. 12319 (1964–1965), amended by Exec.Order 11,375, 3 C.F.R. 14303 (1966–1970), and supplemented by 41 C.F.R. § 60 (1992). The parties further expressed in the contract their understanding of what compliance with federal and state restrictions on discriminatory hiring entailed:

> Compliance includes but is not limited to, giving equal opportunity both to those seeking employment and those seeking services without regard to ... religion.

Purchased Child Protective Services Contract at 3.

solely to adoption workers but to all employees. Only those who pass religious muster are considered by this employer for any endeavor of any kind, whether as an accountant, a receptionist, a truckdriver, or maintenance worker.

Following an investigation of Speer's claim of unlawful discrimination, the Texas Commission on Human Rights joined her in an action against the employer for its discriminatory employment practices. Both the trial court and court of appeals held that the employer could discriminate because, as a matter of law, it was a "religious corporation." *See id.* § 5.06(1). I believe that both courts applied an incorrect legal standard,[2] but that question is neatly avoided by today's opinion.

Instead the majority insists on resolving this case solely on the basis of a matter wholly outside the record. For the first time during the entire course of this litigation, at oral argument before this court on October 6, 1992, the employer surprisingly urged a dismissal for mootness based on its unsubstantiated claim that the adoption services program, including the position of adoption worker, was abolished on January 31, 1992. Although lacking any factual basis with which to evaluate how the employer's discriminatory practices have thereby been affected,[3] the majority grasps this unverified and belated claim as an excuse for declaring this dispute ended.

By endorsing such evasion of our state prohibition against employment discrimination, the majority ignores the lessons learned in the enforcement of Title VII of the 1964 Civil Rights Act, 42 U.S.C. 2000e–1. Employers' attempts to moot discrimination claims by abolishing illegal employment practices have been resoundingly rejected. *See, e.g., Rowe v. General Motors Corp.,* 457 F.2d 348, 359 (5th Cir.1972); *Local 53, Int'l Ass'n of Heat and Frost Insulators v. Vogler,* 407 F.2d 1047, 1055 (5th Cir.1969); *Jenkins v. United Gas Corp.,* 400 F.2d 28, 33 n. 11 (5th Cir.1968). The focus of the inquiry in a hiring discrimination case should be upon the employment practices that gave rise to the complaint, *see Parham v. Southwestern Bell Telephone Co.,* 433 F.2d 421, 425 (8th Cir. 1970); the employer's subsequent machinations should not divert the Court's attention. What the majority now praises, one court has aptly described as "resist-and-withdraw" tactics, which "in the face of litigation are equivocal in purpose, motive and permanence" and should in no event

---

2. Certainly I recognize that religious employers, to implement their purpose, must be able to select those employees who put into effect their religious tenets. In defining the contours of the statutory exception, appropriate deference should be accorded to these needs while remaining faithful to the legislative objective of assuring equal employment opportunity. The exception cannot be interpreted so narrowly as to encompass only the spiritual leaders of an organization; nor can it be read so broadly as to exempt all workers hired by an employer that professes a religious mission.

The concurrence would go to the extreme of permitting invidious discrimination on the basis of race, sex, or religion by any employer with a showing of little more than (1) the name of the employer contains a religious affiliation; (2) its charter references a general religious purpose; and (3) employees are required to sign a statement of religious affiliation. 847 S.W.2d at 238–39 (Gonzalez, J. concurring). His test would tear a major loophole in our state discrimination laws. My unwillingness to offer an *alternative to this standard should not be read* as in any way condoning the religious extreme that he would impose on Texas.

3. Even the discussion at oral argument was minimal. In response to two questions that I asked, the totality of what the court learned was:

"[T]he agency effective January 31, 1992, has gotten out of the adoption service business, and no longer employs adoption workers."
"As I say, they do not have a senior adoption worker position any longer."

No other member of this Court made any inquiry of any type to the employer's attorney concerning the only issue on which the majority now decides this case.

The Post–Submission Brief of Respondent at 2 merely reiterated without detail the same generalization in a single line:

"Effective January 31, 1992, [the agency] withdrew from offering adoption services and the Senior Adoption Worker position was abolished."

Nor did the employer come forward with anything more when Speer and the Human Rights Commission challenged the unverified nature of this claim. *See* Petitioners' Joint Reply to Post–Submission Brief of Respondent at 4–5.

provide the basis for a dismissal on mootness grounds:

> The defendant is free to return to his old ways. This, together with a public interest in having the legality of the practices settled, militates against a mootness conclusion.... [V]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, *i.e., does not make the case moot.*

*Jenkins,* 400 F.2d at 33 n. 11 (quoting *U.S. v. W.T. Grant Co.,* 345 U.S. 629, 632–33, 73 S.Ct. 894, 897–98, 97 L.Ed. 1303 (1953)) (emphasis in original); *see also City of Mesquite v. Aladdin's Castle, Inc.,* 455 U.S. 283, 289, 102 S.Ct. 1070, 1074, 71 L.Ed.2d 152 ("It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive [the judiciary] of its power to determine the legality of the practice.").[4]

Speer's claim was of such "general public importance" that the Texas Human Rights Commission filed a separate suit against the employer that was later consolidated with this case. Emphasizing that much more than Speer's personal rights are at stake, the Commission seeks to vindicate the public interest as required by its statutory mandate. Tex.Rev.Civ.Stat.Ann. art. 5221k, § 7.01(a). Because the Commission is empowered to protect past, present, and future employees, its authority extends beyond the claim of a single individual:

> [E]radication of discrimination by race and sex promotes public interests and transcends private interests. Each step along the road to equal employment opportunity takes us closer to the goal of a truly open society, confining individuals only within boundaries set by their own talents and determination.

*EEOC v. Kimberly–Clark Corp.,* 511 F.2d 1352, 1359 (6th Cir.), *cert. denied,* 423 U.S. 994, 96 S.Ct. 420, 46 L.Ed.2d 368 (1975); *see also EEOC v. McLean Trucking Co.,* 525 F.2d 1007, 1010 (6th Cir.1975) (upholding EEOC's right to sue even though the individual plaintiff had settled a separate suit against the employer). Urging its "continuing interest in this cause," the Commission implored this Court to reach the merits of this case:

> Nothing has changed in this cause that makes its final resolution by this Court of any less public importance. Indeed, now that the Court of Appeals has publicly opined on the subject, the case is arguably of more public import now than when it first arose. The controversy is real—not imagined—and capable of judicial resolution.

Petitioners' Joint Reply to Post–Submission Brief of Respondent at 14. By completely disregarding the public impact of employment discrimination and completely failing to explain why the Commission cannot now proceed, the majority today severely handicaps public enforcement of our equal employment laws.

In its continuing effort to eviscerate substantial portions of the prior decisional law of this Court,[5] the majority has effectively

---

**4.** The majority seeks to distinguish all of this persuasive authority on the basis that this particular employer did not merely abolish one job but "[dis]continued [related] operations." 847 S.W.2d at 229, n. 4. This is a distinction without a legally significant difference. But the majority also lacks any evidence that even this purported distinction is real. *See supra* note 3. We have absolutely no verification as to how this employer may have reorganized its business or what remains of the Presbyterian Children's Home and Service Agency if child placement is no longer a part of its work. All we can be sure of is that whatever enterprise continues to exist, it is one that, by its own lawyer's admission, routinely engages in employment discrimination.

**5.** *See, e.g., Boyles v. Kerr,* 1992 WL 353277 (Tex. 1992) (Doggett, J., dissenting) (objecting to majority's overruling of landmark Texas Supreme Court decision permitting recovery for negligence resulting in emotional distress); *Walker v. Packer,* 827 S.W.2d 833, 851 (Tex.1992) (Doggett, J., dissenting) (noting majority's "mass execution of precedent," encompassing "a dozen or more Texas Supreme Court cases and countless decisions of the courts of appeals"); *Carrollton–Farmers Branch Indep. Sch. Dist. v. Edgewood Indep. School Dist.,* 826 S.W.2d 489 at 525 (Tex. 1992) (Doggett, J., dissenting) (discussing rejection by majority of its own decision issued less than one year previously); *Stewart Title Guar. Co. v. Sterling,* 822 S.W.2d 1, 12 (Tex.1991) (Doggett, J., dissenting) (disregarding its own recent precedent, majority looks instead to overruled case); *Rose v. Doctors Hosp.,* 801 S.W.2d

rewritten *Camarena v. Texas Employment Comm'n,* 754 S.W.2d 149 (Tex.1988). There farm workers, who challenged their unconstitutional exclusion from unemployment benefits, were improperly denied attorney's fees by the trial court. Because of legislative developments subsequent to that judgment, the court of appeals held the requested declaratory relief moot and also barred recovery of attorney's fees. We unanimously and unequivocally rejected the claim of mootness:

> Clearly, a controversy exists between the farm workers and TEC. The "live" issue in controversy is whether or not the farm workers have a legally cognizable interest in recovering their attorney's fees and costs.... [T]he attorney's fees issue ... is an integral part of the farm workers' claim and as such breathes life into the appeal. Due to the existence of the "live" issue of attorney's fees and costs, we hold that the suit was not moot.

*Id.* at 151. Attempting to distinguish *Camarena,* the majority modifies its holding in the following nonsensical way: a party prevailing in the trial court but wrongfully denied attorney's fees may appeal; a party who does not prevail, even if as a result of the trial court's legal error, may not appeal. Yet a party's right to attorney's fees is either a right that may be pursued by appeal or it is not. While the claim for attorney's fees necessarily hinges on the

merits of the case, when the merits are erroneously decided in the lower court, the prevailing party should be able to recover its attorney's fees in this Court. Speer asserts that the only reason she "did not prevail at any stage of this litigation," 847 S.W.2d 228–29 at n. 4, is because of the mistakes committed, as a matter of law, by the courts which have previously considered her case.

Instead of opposing the obstacle to equal opportunity raised by the majority, the concurrence not surprisingly apologizes for it while denigrating this dissent. 847 S.W.2d at 233 (Gonzalez, J., concurring). This most lengthy of all the writings issued today is strangely rationalized as required to "respond to the dissent," *id.* at 233, which is dismissed as "offer[ing] little in the way of explanation or analysis." Since neither detailing the appropriate legal standard nor evaluating the evidence is in any way required to respond to the shortcut taken by the majority today, this dissent is directed toward the unsupported refusal to consider the merits of this appeal. The concurring justice answers questions raised solely by his own excessive zeal at the same time he proclaims they cannot be properly addressed.[6] In a bulging bundle of contradictions, he decides a case that he insists should not be decided, assesses the factual sufficiency of the lower courts' decisions while proclaiming such review beyond this Court's power to conduct,[7] tink-

---

841, 852 (Tex.1990) (Doggett, J., dissenting) (disapproving of rejection of recent controlling precedent).

**6.** The extent of this zealotry is amply demonstrated by the incredible claim that somehow I believe:

> the religious exemption means only that a Jewish congregation cannot be forced to hire a Baptist minister as their Rabbi....

847 S.W.2d at 240 (Gonzalez, J., concurring). Despite my clear statement that "[t]he exemption *cannot* be interpreted so narrowly as to encompass only spiritual leaders," *supra* note 2, the concurrence incredibly misrepresents my views as precisely the opposite. 847 S.W.2d at 240 ("The dissent ... proceeds to construe 'religion' so narrowly as to include little more than 'spiritual leaders of an organization.' "). A similar misrepresentation is found in the suggestion that my commitment to our vital freedom of religion, Tex. Const. art. I, § 6, is so narrow as

to encourage a bureaucrat under every church pew. *See id.* at 240.

**7.** The court of appeals correctly explained the distinction between the legal and factual issues presented for review:

> The [trial] court concluded as a matter of law that PCHSA is a religious corporation within the meaning of the Act. In her first point of error, Speer asserts that this legal conclusion is erroneous as a matter of law. In her second point of error, Speer complains that the trial court found that PCHSA is a religious corporation "within the meaning of ... section 5.06(1)." The trial court made no such finding of fact.
>
>     \*    \*    \*    \*    \*    \*
>
> Speer's second point of error complains of a non-existent finding.... [W]e review only the trial court's *legal* determination that PCHSA is a religious corporation within the meaning of section 5.06(1) of the Act.

ers with the legal standard applied by the court of appeals while condemning my dissatisfaction with that standard as "mere[ly] pretext[ual]," 846 S.W.2d at 233, and even attempts to justify discrimination on grounds not relied upon by the trial court.[8]

Apparently lacking confidence in the majority's disposition of this matter on mootness grounds, the concurring justice engages in a one-sided theological debate that misstates my position on issues that I do not purport to address. Positioning himself as defender of the faith, he says his writing is essential "to refute [the claim] that 'Christianity' is not a religion. 846 S.W.2d at 233. Yet such theological questions, which hardly require a dictionary for an answer, see id. at 240, are in no way germane to today's proceeding.[9] As a Christian, I realize that the depth of an individual's personal religious conviction is not measured by how loudly it is publicly proclaimed. As a judge, I exercise restraint in addressing the relevant issues.

Mootness[10] is a judicial roadblock used here to prevent Georgette Speer and the Texas Human Rights Commission from ever having an opportunity to hold an employer accountable for undisguised discrimination. My reference to the obvious implications of today's writing for racial discrimination has been described by the majority as "oblique," 847 S.W.2d at 229, and by the concurrence as unjustified, id. at 241 (Gonzalez, J., concurring). If either

writer has any explanation as to why today's ruling cannot be relied upon by those who engage in the most blatant form of racial discrimination, they certainly have not provided it. There is nothing "oblique" about this issue; it is directly and pointedly presented. This decision is in no way limited to Georgette Speer or even to those who continue to suffer all too pervasive discrimination on the basis of religion; rather it is a writing which will significantly undercut those who struggle against racism and sexism in the workplace. As Dr. King also said,

> [Equal employment opportunity] [l]egislation that is evaded, substantially nullified and unenforced is a mockery of law. Significant progress has effectively been barred by equivocations and retreats....[11]

Another such retreat has occurred here today.

GAMMAGE, J., joins in this dissenting opinion.

---

824 S.W.2d at 593. Although greatly enamored with other portions of the court of appeals' decision, particularly the result it reaches on the merits, the concurrence prefers to disregard its analysis of this matter critical to our review.

8. See 847 S.W.2d at 242 n. 2 (Gonzalez, J., concurring) (noting employer's proffered defense related to providing job opportunity for another person when the record clearly shows that the other applicant's job qualifications were unknown to the employer at the time Speer was rejected).

9. Religion "means all aspects of religious observance and practice, as well as belief." Tex. Rev.Civ.Stat.Ann. art. 5221k § 2.01(14). An argument has been advanced that application of this statutorily defined term requires reference to individual Christian denominations rather

than Christianity as a whole. While this interpretation may be wrong, it never figures in any way in the writings of either the majority or the dissent. Indeed, even Justice Gonzalez fails to analyze this nonissue. Rather he poses the false question "is Christianity a religion" purely as a diversion from the wrong committed today.

10. Nothing in the prior opinions of this court referenced by the majority requires a dismissal for mootness here. See 847 S.W.2d at 228 (citing General Land Office v. Oxy U.S.A., Inc., 789 S.W.2d 569, 570 (Tex.1990); Firemen's Ins. Co. v. Burch, 442 S.W.2d 331, 333 (Tex.1968)).

11. Dr. Martin Luther King, Jr., Where Do We Go From Here: Chaos or Community (1967), excerpts reprinted in A Testament of Hope: The Essential Writings of Martin Luther King, Jr. 561 (James Melvin Washington, ed., 1986).